HILL *et al. v.* DEAL *et al.*

No. 11931. NOVEMBER 13, 1937.

44

D. C. Jones, for plaintiffs.

R. Lee Moore and Fred T. Lanier, for defendants.

GRICE, Justice. The three subscribing witnesses to the instrument offered for probate were sworn, and testified to its due execution by the testatrix as her will, that the same was freely and voluntarily executed, and in effect that the alleged testatrix was of sound and disposing mind and memory. When the propounders showed these three facts, they made out a prima facie case for the will; and unless other testimony was brought forward which made an issue as to one of these three essentials, or unless the caveators produced evidence tending to show that the alleged will was the

result of undue influence, as set forth in the caveat, the propounders were entitled to a verdict admitting the will to record. No effort was made to break down the testimony of the three subscribing witnesses as to the actual execution of the will in the manner prescribed by law. There is likewise no evidence in the record to justify a verdict refusing probate because of "undue influence exerted over [the alleged testatrix] by the said Mrs. Ruth Hill and Mrs. Thelma Livingston." It is true that the will gives to these two daughters all her property, to the exclusion of two sons, and the children of a third son who predeceased his mother; that the testatrix resided in her own home with her daughter, Mrs. Livingston; and that the other daughter and beneficiary, Mrs. Ruth Hill, visited her often, and at her mother's request wrote down what her mother said she desired to go into her will, and at her further request had it put into type; that the wife of David L. Deal, who frequently visited her, went to her home to see her on the night of the day, she said, "they claim it [the alleged will] was signed," and swore that Mr. Hill, the husband of Mrs. Ruth Hill, met her at the door and told her not to come in. One or all of the foregoing pieces of testimony might raise the suspicion that the paper offered for probate was not the will of Mrs. Mary A. Deal, but that instead it was executed by her when old and feeble and on account of some undue influence exercised over her by the two daughters named; but there is no circumstance or a chain of circumstances that would justify a verdict based on the theory that any undue influence was exercised. A bare suspicion, even in a civil case, can not be the basis of a finding of fact. The most that could be claimed would be that there are circumstances in the record that show that the two sole beneficiaries had the opportunity to exercise or to attempt to exercise undue influence on their mother at about the time the instrument was signed. There is no evidence that they did exercise it, and nothing to justify the inference that they did. The fact that the two daughters were with the testatrix during her latter days, more than the caveators were, affords no basis for a finding that they used undue influence.

Was there any testimony to show that the testatrix was not of "sound and disposing mind and memory?" These words are legal terms, and they should be given the meaning which the law attaches to them, and none other. "Every person may make a will,

unless laboring under some legal disability arising either from a want of capacity or a want of perfect liberty of action." Code, § 113-201. The law does not withhold from the aged, the feeble, the weak-minded, the capricious, the notionate, the right to make a will, provided such person has a decided and rational desire as to the disposition of his property. Code, § 113-202. The Code indicates what is meant by "decided." It does not connote stubborness, or even mental strength. It simply means that the mind must have capacity enough to frame a desire that is certain, or one that has distinct limits. To be rational does not mean that the desire must spring from a strong intellect, but that it is consistent with reason. "And in making the inquiry it would seem from the very words of the Code that attention is to be given, not so much to the state of the mind as an abstract philosophical or medical question, as to its capacity for the precise thing in hand. For a man may say and do things which a medical man would take as evidence of insanity, and yet it may be that he is nevertheless able to have a decided rational desire as to the disposition of his property." *Gardner* v. *Lamback*, 47 *Ga.* 133, 193. When testamentary capacity is the issue, that must be determined by the condition of the mind at the time of the execution of the will. *Terry* v. *Buffington*, 11 *Ga.* 337 (56 Am. D. 423); *Brown* v. *Kendrick*, 163 *Ga.* 149, 168-9 (135 S. E. 721); *Cook* v. *Washington*, 166 *Ga.* 329 (143 S. E. 409). Though, as tending to illustrate the condition of the mind, evidence may be received as to what was the mental capacity at a prior or a subsequent time, yet if it be certain from all the testimony that at the time of the execution of the instrument there was no want of testamentary capacity, the instrument offered will not be refused probate on the ground of lack of sound and disposing mind and memory. What was observed by Russell, Chief Justice, in *Hillyer* v. *Ellis*, 171 *Ga.* 300 (155 S. E. 180), is also true of the record in the instant case: "While there was some evidence that testator was irrational at several specified times, while suffering delirium, there was nevertheless no evidence that such was the case at the time he signed the will, but on the contrary there was direct testimony that at the time of the execution of the will he was rational and mentally normal, and his will as to the disposition of his property clear and distinct."

To sustain the verdict refusing probate, the caveators rely on the testimony of Mrs. David L. Deal, H. A. Deal, Mrs. H. A. Deal, Etta Simmons, Fannie Strouse, Jake Strouse, D. H. Smith, and Dr. Floyd. The last time Dr. Floyd saw the testatrix before she signed the will was on September 4. He testified that up to that time she was of sound mind, so far as he had observed. He next saw her on September 14, two or three days after the will was executed. A reading of his testimony will disclose that it afforded no basis for the claim of the caveators. It shows affirmatively that during all the times that he visited her, both before and after the will was signed, she was sound mentally until about a week before her death. She died on September 24. Her remark, two or three days after the will was executed, "I want to go home," although she was then at home, an aged, feeble, and sick woman, was the basis of his testimony: "I then realized for the first time her mind was off. . . Right at that particular time when she said that to me I would say that she was off, but on the 16th I was back there again, and she was brighter and clearer." Mrs. David L. Deal was at the home of testatrix on the day the will was signed, and talked with her; but she was not at the home when the will was signed. She testified to two fragments of conversation with the testatrix, in one of which she asked her daughter Thelma, who lived with her, if she got home last night, and inquired, "How did you leave your aunts in Florida?" A little later she asked, "Is it raining? Hasn't it been raining?" The most that could be said of this testimony is that it might indicate that she was "out of her head" at the time the statements were made. A little later on that day the witness gave her the paper to read, and the testatrix was holding it upside down.

On September 11 or 12, H. A. Deal visited his mother. He testified that at that time she asked him if he didn't have some plum trees in front of his house, and he said "No." When he visited her on September 17, she asked him the same question. He did not testify that in his opinion there was anything wrong with her mind on September 11 or 12; but she having asked him again on the 17th about the same plum trees, he testified: "I would think that that would indicate that her mind was bad." Etta Simmons related a conversation, in the week following the signing of the paper, with the testatrix, who spoke of having been in

Florida, when in fact she had not. Miss Fannie Strouse, a niece, told of a similar conversation on September 16. Mrs. H. A. Deal testified as to conversations with testatrix on September 13 and 14, in both of which the testatrix made some statements which appeared to be foolish. The testimony of Jake Strouse was that he talked with testatrix before and after the date of the will: "I saw her mind was not right. She talked a little, and she stopped. I saw her mind was not right. She talked kind of crazy. When I was there, three, four, or five days after the will was made, as to what she said on that occasion to lead me to believe her mind was affected, was, she would just start to tell something to me and then stop talking about it. From that fact I reached the conclusion her mind was not right, and she would start a new subject." D. H. Smith testified to a conversation that he overheard between McDougall, one of the attesting witnesses, and another person in his store. It took place before the death of the testatrix. The testimony was to the effect that McDougall made a statement that "he had a job he did not like, and that he had been witnessing a will;" and later he represented the will as being that of Mrs. Mary A. Deal, the testatrix, and said that "he witnessed a will of a person who did not know what she was doing."

The testimony of D. H. Smith at most only cancels the effect of the testimony of one of the subscribing witnesses. The testimony of the other unimpeached subscribing witnesses, and of Mrs. Black, that at the time the will was signed Mrs. Mary A. Deal was normal, mentally, and capable of making a will, can not justify a refusal to probate it because of her mental condition before or after that. If, therefore, there is any evidence to make an issue for the jury as to her testamentary capacity at the time she executed the instrument offered for probate, it is that of H. A. Deal and Mrs. David L. Deal. Accepting their testimony at face value, as we must, and do, it is yet not enough to raise an issue before the jury as to the mental capacity of the testatrix. At best their testimony is only to the effect that on the same day the will was executed they heard the testatrix make some foolish observations which, unexplained, might indicate that she was flighty at the time those conversations occurred. What they swore to falls far short of what some testified to in *Cook* v. *Washington,* supra, where this court sustained a directed verdict against the caveators. In

that case a witness testified that she went to the home of the testatrix, Mrs. Hunt, on the day she signed the will, found a doctor and remonstrated with him about letting Mrs. Hunt have drugs, and the doctor said she would die if she didn't have them. On seeing the witness Mrs. Hunt rushed to her, asked where she had been, and said that since she had lived through that day she would get well; that it had been a terrible day. Witness tried to calm her. "I should consider her condition, at that time,—let me get the right word—in a state of delirium; this was after these gentlemen as witnesses to the will had come out, and I would imagine about one half to an hour, possibly not so long after. . . I would not consider her capable of making a will at any time for a week before her death." The instance above described was on the day she executed the will and the day before her death. Another witness in that case testified that the testatrix was flighty and out of her head. In *Mason* v. *Taylor*, 162 *Ga.* 149 (132 S. E. 893), the contest was over a codicil executed on July 13, 1923. A witness swore to certain things which he said indicated that the testatrix's mind was deteriorating; that she could not remember important events; that she would "all of a sudden forget what she was talking about, and then she could not quote scripture like she used to. . . I would . . say she was not rational in July, 1923, or else she would not have signed that codicil. That is one reason why I say she was not rational, because she signed that codicil. That is not the only reason." Other witnesses having testified to the soundness of the testatrix's mind, the judge directed a verdict for the propounders; and this court in affirming it said that "from a careful examination of the entire record we are of the opinion that there is no evidence of mental incapacity or undue influence."

In *Burroughs* v. *Reed,* 150 *Ga.* 724 (105 S. E. 290), it was ruled that there was no evidence of mental incapacity at the time of the execution, although a witness testified that the testator's mind "seemed to come and go. He could not remember what had been said to him." This court there sustained a directed verdict upholding the instrument. The direction of a verdict for propounders was sustained in *Walters* v. *Walters,* 151 *Ga.* 527 (107 S. E. 492). The will in that case was executed May 24, 1915. The testator died in December thereafter. A physician testified as

50

follows: "In May, 1915, I considered his mental condition weak —his mental condition was not very good. I could not say whether in my opinion he had mind enough to have a rational and decided opinion about what he wanted to do about business transactions—he might have just voluntarily told anything that he wanted done. I saw him all through the year. I could not say as to his resistance power—mental power; the old man was pretty weak. You know you take a man in his condition—heart trouble, diabetes, hardening of the arteries, and he is naturally in a weakened condition. With reference to what effect that would have upon his mental powers, i. e., giving directions, and whether he could not resist the importunities of others, of course a man in that condition could not resist very much, and he would be easier influenced, of course. . . He was partially rational in his conversation; sometimes he would be rational and sometimes he would not be so much so; when he was not so much so he would talk at random." Another physician testified as follows: "I have been seeing him all of my life. I knew more about his mental condition in 1914 than I did in 1915. I never saw him alone at any time. Always when I would see him and I would speak sometimes and he would speak, but sometimes he would not, and sometimes he would notice me and then again he would not. . . He had a general complication of trouble at the time. He had Bright's disease, and it would naturally harden the blood vessels. That has a whole lot to do with the mental state—it deteriorates the brain; that is what some people call softening of the brain, and each year that would grow worse. I don't think his mental condition could have improved any in 1915; it was worse, if anything, from my standpoint than in 1914. In regard to what extent his mind had been impaired, his nervous system, you might say, was impaired, and body very weak, naturally the brain was weak—it was very weak, and he was incapacitated to transact business." There being positive evidence that at the time the will was signed, the testator was of sound mind, the court held that the evidence quoted above was not sufficient to carry the case to the jury.

In *Wood* v. *Lane,* 102 *Ga.* 199 (29 S. E. 180), this court, through Chief Justice Simmons, said: "This case has been tried twice. At both trials the jury found against the will, and each verdict has been set aside by the trial judge. In granting the second new

trial, the trial judge did so expressly upon the ground that the verdict was contrary to law and to the evidence, and was without evidence to support it. We have carefully read the evidence contained in the record, and we have discovered nothing that would authorize the jury to set this will aside. The evidence, in our opinion, is overwhelming in favor of the testamentary capacity of Mayo at the time this will was made. While he was in feeble health and had been confined to his room and bed for seventeen years, yet the evidence clearly establishes the fact that at the time of making this will he knew the contents thereof, he comprehended his relations to his family and their relations to him, he understood the nature of the estate he was conveying, and he disposed of the same with understanding and with reason. The evidence on the part of the caveators shows nothing to the contrary. The gist of this evidence is that the recollection of the testator was not as good as it had formerly been; that he could not recollect incidents of recent date as well as he had formerly done; that he would tell the same anecdotes two or three times during the same day; that when his cotton was sold and the accounts of sale were shown to him, it was with difficulty that he could be made to understand them, and frequent explanations had to be made to satisfy him. There was but one witness who testified in terms that the testator did not possess mental capacity sufficient to make a will, and that opinion was founded upon the facts above recited. The other witnesses on the part of the caveators say that in their opinions the testator could not transact business, and give as the foundation for these opinions a similar state of facts, viz.: a want of recollection, etc." In that case, it is to be observed, the court held that the finding of the jury against the will was without evidence to support it, though one witness testified in terms that the mental capacity was lacking, his opinion being founded on the facts above recited.

In *Stancell* v. *Kenan,* 33 *Ga.* 56, the will of Judge Owen H. Kenan was involved. On the trial of a caveat on the ground of lack of testamentary capacity, the jury denied probate. Physicians testified. Some gave it as their opinion that he had, and others that he had not, such capacity. Various incidents were testified to, supposed to indicate great mental infirmity. In reciting those, the judge delivering the opinion said: "On one occasion he [the testator] ordered the wagon of a visitor to be put into the

stable and fed; on another, speaking of fowls, he called them mules; on another, he offered fifty cents apiece for ducks, the market price being ten cents; on still another, being met and addressed by a neighbor, he exclaimed, ' Who are you? ' Again, being invited to a settlement of mutual accounts, he postponed it on account of the absence of the young man who resided with him, and attended to his business occasionally. Also, on one occasion (probably immediately after the execution of the paper propounded), whilst traveling in a railroad car, he talked in a voice so loud, and in a manner so boisterous and incoherent, passing rapidly from one subject to another, that the witness thought him deranged. There are doubtless other incidents testified to, of more or less significance, but these are cited as most significant on each side." The court set aside the verdict, because it was contrary to law; for that, notwithstanding the testimony showed that in addition to being one of the most erratic of men, and having some years before been stricken with paralysis, after which his mental faculties were never restored to their antecedent vigor and his memory was impaired, it also showed that enough remained to answer the requirements of the law in the performance of a testamentary act; that he understood the nature of the instrument he was making; and that he was capable of remembering generally the property subject to his testamentary disposition, and the persons related to him by the ties of blood and affection.

The truth is that the testatrix in the case at bar was old and feeble; the days of her sere and yellow leaf had come; on occasions near the time the will was executed she seemed what is sometimes spoken of as flighty; the frosts of many winters had left their marks, and disease had made its footprints. But there is nothing in the record to show that at the time the instrument offered for probate was executed she was mentally incapacitated to make a will. What Judge McCay said in *Gardner* v. *Lamback,* supra, is pertinent here: "The right to say who shall, after the death of the owner, have his property, is a right long held precious in the history of English law. A large majority of wills are made in the last hours of life, a time necessarily of pain, trial, and disturbance. And it is a wise provision of the law that whilst it takes great precaution to prevent fraud and imposition, it does not withdraw the testamentary privilege until the reason itself be gone. It is

a precious right, and one that should be guarded with jealous care, that the aged and infirm, the weak-minded and eccentric, shall have this security for care and attention on a sick bed. And it may be truly said, without any harsh criticism on human nature, that many a fired brain has been cooled by gentle hands, and many a death bed cheered and watched over with kind care, which, but for this tender care of the law for this testamentary right, would have been neglected and deserted." The testimony demanded a finding in favor of the propounders; and regardless of the special assignments of error, a new trial should have been granted because the verdict was without evidence to support it, and therefore contrary to law. *Judgment reversed. All the Justices concur*