## MARTIN *et al. v.* MARTIN.

No. 12006. JANUARY 13, 1938.

*W. D. Martin, G. P. Marlin,* and *J. B. G. Logan,* for plaintiffs. *Charles Emory Smith,* for defendant.

JENKINS, Justice. The testimony as to mental capacity was as follows: R. P. Gober, one of the subscribing witnesses, testified for the propounders of the will that he had known the testatrix since 1873; that when she executed the paper in May, 1925, he thought she had mental capacity to do so, forming his opinion from "the way she was talking;" that "she talked like she always did to me, got to talking about old times . . and about how times had changed;" and that he saw nothing to indicate she was "incompetent to make a will." H. A. Carlton, who was one of the witnesses of the will of this testatrix and of her sister, which was executed at the same time, testified that "they appeared to be normal ladies of their age, and capable of understanding things;"

that the wills were read over to them, and "they seemed to be of good mind, and said [the instruments] were like they wanted them." G. P. Martin, one of the propounders, who prepared the will, testified, that, before the will was executed in 1925, the decedent had a stroke in 1922, and "it looked like for about six months she was going to die  .   .  but she got to getting better, and, while she never did get where she could walk, her mind was just as good six months after she had that stroke as it ever was in her life;" that "she would talk and she was jovial and cheerful, and her mind was clear up to the day she died;" that when she had the stroke of paralysis and "while she was so sick, she had hallucinations, and was full of uremic poisoning, but after the clot dissolved on her brain she got all right;" that she "did not die of paralysis, she died with the flu;" that "for some time after the stroke until her system cleared up of the poison, she did not have any mind much, but after her system was cleared up, her mind was as good as mine or any one else's." Mrs. Alice A. Martin, caveatrix testified that the stroke of paralysis left the decedent "in bad shape physically and mentally  .   .  while I was there, her tongue was affected, and her mind seemed to be the same way.  .   .  As to whether I saw her around May 29th, 1925 [the date the will was executed], I don't know, I haven't got the dates down.  I seen her along then, but I don't recollect the dates when it was.  I saw her at intervals from the time she was stricken until she died.  As to whether I visited her on the day before or the day after she made her will—no, I didn't know nothing about the will.  I never heard of the will until after sister Mat's death.  I wasn't thinking of a will.  As to whether she would have been competent to make a will between the time she was stricken and the time of her death, no, sir, I don't think so.  When you take her back to childhood days, her mind seemed perfectly good as to things that happened then, but she couldn't remember after she had her stroke like she could before then.  I don't know as I recall anything else that she did that was unusual that caused me to form my opinion as to her mental condition.  I was up there along in July or August, and she was what you might say simpleminded, about like she was at first.  I don't think she transacted any business after she had her stroke.  Sister Mat transacted her business.  I would hear Mat say that [the testatrix] had sold a

bale of cotton, and I don't know what she did with the money. She would sell her cotton and she would manage her own affairs, and Mat would say [she] would do as she pleased about it . . As far as I know, Mattie and [the testatrix] looked after their businesses as long as they lived." A. W. Wood testified for the caveatrix, that he thought he visited the testatrix and her sister "along in June, probably in 1925, I think it was about the third Sunday in June," and he "saw her along at intervals from her stroke until she died;" that "physically she was in a rolling chair, and mentally I couldn't say," although "she was a little different, you could tell that, I don't much believe she'd a been capable of making a will;" that he judged her by "the way she used to be. She used to be a girl with a whole lot of life, and that time she seemed to be off. I don't know whether it was physically or mentally. As we grow old we lose some of our pep, and of course there would not be as much fun in a sixty-year-old woman, and they wouldn't seem like they did when they were school kids; but that is the reason I thought [the testatrix] wasn't able to make a will." Escott Martin testified for the caveatrix, that he visited where his aunts, the testatrix and her sister, were living in 1925, but did not recall the times. "I was in there one time and talked with [the testatrix]. It was in the late spring or early summer of 1925, and she was telling me about getting in a rolling chair and going over to what they called the Tony place (that's a place across the river), and what I had done the year I lived over there, and she went on and told me something about getting a calf across the river, and that happened about the time of the world war. I don't recall the month, but it was in the late spring or early summer of 1925, possibly June or July. . . I don't think she was the same person mentally as she was before she was stricken. I would say her mental condition was bad. Well, just my opinion, she wasn't capable of making a will any time I was there, telling you something that was reliable in one breath and then telling one of the biggest tales that never happened, or something that happened ten years ago. . . I remember it was in the summer of 1925 when she told me this story about the calf. . . I do know, some time along about the time this will was dated, she told me about getting the calf across the river, and going to the Tony place in a rolling chair." B. E. Martin testified for the caveatrix, that

he visited the home where the testatrix was "from 1925 on up to last year, I reckon; . . was there practically every week, and most of the time I went in to see [her]. I think her mental condition was bad. She would start to tell things and get confused and forget. . . She never recovered her mental and physical strength, and I don't think her mental condition was such that she could make a valid will disposing of her property. . . When I would go there, she would know me part of the time, and I think I have been there a few times when she did not know me. That was not when she was first stricken, but later on when she was up in the rolling chair, a time or two, I was there, and some one told her who I was, and then she would say a few words; she spoke like her tongue was paralyzed, and sat there like her mind was a blank. I don't know what time that was. It was between 1925 and the time she died. I believe she died in 1927. . . In 1924 I met a man who rode with me, and he wanted to go over there and rent [her] place, and I went by there and went in and told her about it, and she told me to see [her sister], and she was in a rolling chair then, and I think she knew what I was talking about."

"While, for the purpose of shedding light upon the state of the testator's mind when the will was made, evidence of his condition both before and after the execution of the instrument may be shown, the testamentary capacity is to be determined by the condition of the testator's mind at the time when he executes . . the will." *Brown* v. *Kendrick*, 163 *Ga.* 149, 168 (135 S. E. 721); *Walters* v. *Walters*, 151 *Ga.* 527, 530 (107 S. E. 492). Incapacity at the time of the execution of an instrument may be shown under the presumption arising from proof that on a previous lunacy inquisition a decedent was adjudged insane, since "such judgment substitutes for the general presumption of sanity a rebuttable presumption of insanity," and in such a case "the onus is cast upon those thereafter asserting sanity to prove it." *Akin* v. *Akin*, 163 *Ga.* 18 (2) (135 S. E. 402); *Terry* v. *Buffington*, 11 *Ga.* 337 (56 Am. D. 423). Even without adjudication, "habitual insanity" also, "when once proven to exist, will," as a rebuttable presumption, "be presumed to continue." But no such presumptions follow from proof of a prior mere "temporary derangement." *Dicken* v. *Johnson*, 7 *Ga.* 484, 490; *Humphrey* v. *State*, 46 *Ga. App.* 720,

722 (169 S. E. 53). A jury issue as to the mental capacity of the decedent at the time of her execution of the alleged will in this case was, therefore, not created by proof merely that, three years before such execution, she had a stroke of partial paralysis, with uremic poisoning and hallucinations, and "didn't have any mind *much*," but without proof that her condition was one of total, habitual insanity, such as mentally incapacitated her from making a will at the time of its subsequent execution, where all the evidence showed that the seriousness of such former condition was only temporary; where the testimony for the propounders showed capacity; and where the additional testimony for the caveator failed to show incapacity at the time of the execution of the will, under the tests of the Code, §§ 113-202, 113-204, 113-205. See *Walters* v. *Walters,* supra; *Mason* v. *Taylor,* 162 *Ga.* 149 (132 S. E. 893); *Potts* v. *House,* 6 *Ga.* 324, 350 (50 Am. D. 329); *Slaughter* v. *Heath,* 127 *Ga.* 747, 749-757 (57 S. E. 69, 27 L. R. A. (N. S.) 1), and cit.; *Griffin* v. *Barrett,* 183 *Ga.* 152 (187 S. E. 828), and cit.; *Hillyer* v. *Ellis,* 171 *Ga.* 300 (155 S. E. 180); *Martin* v. *Martin,* 185 *Ga.* 99 (194 S. E. 586), involving the will of the sister of this testatrix. The mere fact that such an aged person may like to dwell upon happenings of the past, that her memory is not as good as it was, and that she does not have the "pep" which she had when young, will not prevent her from having a decided and rational desire as to the disposition of her property.

2. Applying the above rules to the evidence respecting the mental capacity of the testatrix, there being no testimony to sustain the allegations of undue influence, a verdict in favor of the propounders of the will on both questions was demanded, and a new trial should have been granted on the general grounds of their motion.

3. The two special grounds present matters not likely to recur at a subsequent trial.

*Judgment reversed. All the Justices concur.*