DUTTON *et al. v.* NASH *et al.*

No. 12219. MAY 13, 1938. REHEARING DENIED JUNE 18, 1938.

*Pemberton Cooley* and *H. A. Stephens Jr.,* for plaintiffs.
*Marvin A. Allison* and *W. L. Nix,* for defendants.

GRICE, Justice. ■ To the caveat as amended the propounders filed demurrers. After considering the original caveat and all amendments, the court overruled the demurrers. The grounds upon which the caveators seek a decree denying the probate of the instrument offered as the will of Anderson Nash are: (1) that at

the time of the execution of the instrument he was a monomaniac; (2) that he was suffering from delusional insanity; (3) that undue influence was fraudulently exerted upon him in the making of the will; and (4) that "from advancing age and long protracted intemperance, dissipations, and excesses both as to the drinking of intoxicating drinks, the taking of drugs, and opiates, and indulging in sexual intemperances, . . testator had become so weak of intellect and will power as to be mentally incapable of executing a will." The last of the four grounds alleged was not subject to demurrer. In view of that fact, and considering all the evidence in the case, we deem it unnecessary to rule on the sufficiency of the other grounds, being of the opinion that the evidence as a whole, as hereinafter discussed, is insufficient to support any ground of the caveat.

The three attesting witnesses testified to the due execution of the will by the testator. They all testified that they did not particularly observe his mental condition at that time, but that they were not impressed at the time that he was mentally incapable of executing a will. One of them testified: "In my opinion at that time I think he was at himself." None of the attesting witnesses testified that he was under the influence of a drug or intoxicant; and the non-attesting witness who was present testified: "His mental condition the day he executed that will was all right so far as I knew. I never did detect anything wrong with Mr. Nash's mind. . . I imagine I had been knowing Mr. Nash around thirty or thirty-five years, ever since 1902 or 1903." This witness was the ordinary of the county, and the will was executed in his office. The caveators are the son and daughter of the testator, children of his first wife. The son testified: "He was not my enemy as I know of it. I suppose he would have done anything in the world for me if I had called him. He wanted us to come back and respect the other woman as a mother, and we sure didn't feel like doing that. . . My father was mentally sound, except when he was intoxicated. At the time in 1935 when he made his will he was a heavy drinker; he had taken dope previous to that time. I have seen him take dope; one night he took it continuously for several hours; he finally went off to sleep. . . He lay there for about ten days, it was little white tablets, and he was taking it as dope. . . I never did see him take any tablets

again. I have seen him with the little bottle in his pocket, but I couldn't swear what was in it; he seemed to be drowsy all the time. . . When he didn't have liquor in him he was all right." He did not testify that his father lacked testamentary capacity generally or on the day he executed the will. The daughter, the other caveator, testified: "I couldn't tell you whether my father was sane on the 29th day of May, 1935, when he made his will or not. He never did seem like himself after all this trouble got up. . . I wouldn't say that my father was under such a mental condition from the time my mother divorced him that he didn't have mental capacity to dispose of this property as he has in the will; for I don't know. I have talked with him when I thought he was mentally unbalanced lots of times. . . I don't know whether he was crazy or not. I ain't never been around nobody crazy." Fourteen witnesses testified in behalf of the caveators. One of them, a physician, testified: "I don't think I have ever visited or seen Mr. Nash when in my opinion he didn't know who his wife was, and his children, and what property he had. He always had that much sense when I saw him." Not one of the witnesses for the caveators testified that in his or her opinion Anderson Nash was mentally incapable, generally or on the 29th day of May, 1935, of making a will; some of them testified that, as far as they knew, he had testamentary capacity at any time they observed him. And there is nothing in the testimony of any of the other witnesses that would authorize a jury to find that Nash was mentally incapable of making a will on the day this instrument was executed by him; nothing that would justify a finding that he was a sufferer from monomania or delusional insanity, as these are defined in *Bohler* v. *Hicks*, 120 *Ga.* 800 (48 S. E. 306), nothing to justify a finding that from intemperance and dissipation, the use of drugs or intoxicants, or both, he became too weak mentally to understand what property he owned, who were his people, and to make a reasonable disposition of his property by will.

The caveators were adults, living apart from their father, with families of their own. The evidence shows that at one time he gave them a farm, for which one witness testified he had paid $10,000. Another witness testified that it was $4000. By his will he left each of them an additional $500. His former wife testified that she did not expect anything from him; that in the separa-

tion settlement she received from him $3600 and a vacant lot in Avondale. By the terms of the will the last wife was given only a life-estate after the foregoing special bequests, with remainder to her child or children by him; but in the event she should die leaving no child or descendant of child surviving her, the entire estate was to be equally divided between his two children, the caveators in this case. The value of his estate was placed by witnesses at $12,000 to $20,000. Considering the value of his estate and the gifts made by the testator to his children in his lifetime, and the lack of evidence tending to show that undue influence was exerted upon him to induce him to execute the will, the very provisions of the will strongly discredit, if they do not actually disprove, the allegation in the caveat that "testator had become so weak of intellect and will power as to be mentally incapable of executing a will, and as a result thereof he made an unnatural and unreasonable disposition of his property." It is true there is evidence in this record to justify the jury in believing that the testator, after many years of happy married life, during which time he enjoyed the respect of his neighbors and those of his church, turned against his blameless and affectionate wife, engaged in improper relations with a young woman about a third of his age, whom he brought into his home as a servant; that he resented the pleadings of his wife and children that he send her away; that he drove his wife from his home, and almost immediately after they were divorced he married the other woman, and thereafter lived a life of inebriety and immorality, which resulted in his expulsion from the church. But, as was said in the similar case of *Bohler* v. *Hicks,* supra, this was "wickedness, pure and simple," and "the law permits an immoral man to make a will directing how his property shall be disposed of after his death, and prescribes no different tests of sanity from those to be applied in determining the testamentary capacity of a thoroughly moral and upright man." There is no evidence whatever that undue influence was exerted upon the testator in the making of the will. The evidence demanded a finding in favor of the propounders, and the judgment approving a contrary verdict and refusing a new trial is

*Reversed. All the Justices concur.*