SPIVEY *v.* SPIVEY.

No. 15918.   SEPTEMBER 6, 1947.

*D. D. Veal,* for plaintiff.

*M. F. Adams* and *R. C. Whitman,* for defendant.

*Eugene Epting,* for persons at interest, not parties.

CANDLER, Justice. (After stating the foregoing facts.) "Upon the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is upon the propounder of the alleged will to make out a prima facie case by

showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and in making it, acted freely and voluntarily. When this is done the burden of proof shifts to the caveator." *Slaughter* v. *Heath,* 127 *Ga.* 747 (9) (57 S. E.' 69, 27 L. R. A. (N. S.) 1); *May* v. *May,* 175 *Ga.* 693 (4) (165 S. E. 617). The caveator contends that there was no burden resting on him, and that a verdict in his favor was demanded because the propounder failed to make out a prima facie case by showing that at the time of execution of the alleged will the testator apparently had sufficient mental capacity to make it. This presents the question of what proof is necessary to establish a prima facie case on the issue of testamentary capacity.

Literally, the words, "prima facie," mean "at first view." A "prima facie case" may be defined as one in which the evidence in favor of a proposition is sufficient to support a finding in its favor, if the opponent produced no evidence, or if all the evidence to the contrary be disregarded.

To make out a prima facie case, and to be entitled to a judgment of probate in solemn form, the propounder must introduce at the hearing all the subscribing witnesses, if living and accessible, or proof of their signatures, if dead or inaccessible. Code, § 113-602. They must be introduced, for examination, even though the propounder knows that their testimony will be unfavorable to him. If some or all of the subscribing witnesses cannot testify as to the testamentary capacity and mental condition of the testator, or give testimony adverse to the propounder and favorable to the caveator, such failure of memory or hostility will not necessarily defeat the will. The propounder may make the proof required by law by other witnesses who can testify as to the essential facts, and upon sufficient proof being made the will may be probated. *Huff* v. *Huff,* 41 *Ga.* 696 (3); *Gillis* v. *Gillis,* 96 *Ga.* 1 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 121); *Wells* v. *Thompson,* 140 *Ga.* 119 (78 S. E. 823, 47 L. R. A. (N. S.) 722, Ann. Cas. 1914C, 898); *Bowen* v. *Neal,* 136 *Ga.* 859 (72 S. E. 340); *Crutchfield* v. *McCallie,* 188 *Ga.* 833, 841 (5 S. E. 2d, 33). In *Thompson* v. *Davitte,* 59 *Ga.* 472, 475, Judge Bleckley, in considering the proof necessary to shift the burden to the caveator, said: "The truth is, that what the propounders have to carry, on

the score of sanity and freedom, is more in the nature of ballast than of cargo. It is just burden enough to sail with—no more." This rule was later quoted in *Credille* v. *Credille*, 123 *Ga.* 673 (51 S. E. 628, 107 Am. St. R. 157). And in *Evans* v. *Arnold*, 52 *Ga.* 169, 181, this court said: "Undoubtedly sanity is the normal condition of man, and if, on an examination of the circumstances attending the execution nothing unusual appear; if the testator appears to be aware of what he is doing, and acts as sane men do, I am of the opinion that a prima facie case is made out, at least that a verdict for the will would be justified, if, when the facts are detailed, the act as done is done as sane men do things—as if a man ask a witness to attest his will, and the witness do so on its being signed by the testator—the very act of signing, intelligently, is a sane act."

In the present case, the three subscribing witnesses to the will were introduced at the hearing and testified to the formalities of execution as required by law. Two testified that the will was read to the testator in their presence; the third, that he thought it was read before he arrived. They testified that the testator signed the will freely and voluntarily, and stated to them that it was his will and what he wanted to do with his property. On the question of mental capacity to make the will, J. M. Gregory, one of those subscribing, testified that he talked with Mr. Spivey for twenty or twenty-five minutes before the other witnesses arrived, and that he mentioned and talked about several things and told them like they were. "With reference to whether Mr. Spivey was at the time he signed that will of disposing mind and memory, he seemed to know what he was talking about." P. C. Rossee, a subscribing witness, testified: "I think Mr. Spivey was in sound and disposing mind that day, so far as I knew. He seemed to be rational." This witness also testified: that Mr. Spivey would leave money with him at the store and would later come or send back for part of it to pay his bills; that, after the will was executed, Mr. Spivey would occasionally come by the store to make purchases, and always seemed to know just what he wanted; that Mr. Spivey kept up with this money and always knew just how much he had at the store; that he didn't notice any particular change in Mr. Spivey the day he signed the will, except that he seemed to be a little older. John D. Watterson, the other subscribing witness,

testified: that he could not say whether he thought Mr. Spivey was of a sound and disposing mind at the time he signed the will; that he was in a bad physical shape and talked very little; and that he would have witnessed the will regardless of the condition of the testator. In rebuttal, the propounder introduced two other witnesses who testified to the general mental condition of the testator during 1946.

The positive testimony of the three subcribing witnesses that the testator signed the will freely and voluntarily and after stating that it was his will and what he wanted to do with his property, and the positive testimony of two of the subscribing witnesses that the testator was apparently of a sound and disposing mind at the time he executed the will, was sufficient to establish a prima facie case on the issue of mental capacity, and would be sufficient to support a verdict in favor of the propounder in the absence of other evidence. There is no positive evidence, on the propounder's side, to the contrary. The contention of the caveator on this issue is therefore without merit.

■ Was there any evidence to show that the testator was not of sound and disposing mind and memory *at the time the will was executed,* and to authorize the verdict sustaining the caveat?

For the statutory rules on determining testamentary capacity, see the Code, §§ 113-201, 113-202, 113-204, 113-205. In accordance with these statutory provisions, it has been held by this court: "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and of affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." *Slaughter* v. *Heath,* supra. "Decided" simply means a mental capacity to frame a desire that is certain, or with distinct limits, and "rational" means that the desire must be consistent with reason. *Hill* v. *Deal,* 185 *Ga.* 42, 46 (193 S. E. 858). In *Gardner* v. *Lamback,* 47 *Ga.* 133, 193, this court held: "To make one incapable of making a will from insanity . . there must be a

'total deprivation of reason.' However old, feeble, weak-minded, capricious, notionate he may be, if he 'be able to have a decided and rational desire as to the disposition of his property,' he is not wanting in testamentary capacity. And in making the inquiry, it would seem from the very words of the Code that attention is to be given, not so much to the state of the mind as an abstract philosophical or medical question, as to its capacity for the precise thing in hand. For a man may say and do things which a medical man would take as evidence of insanity, and yet it may be that he is nevertheless able to have a decided rational desire as to the disposition of his property." Although evidence as to the mental capacity at a time prior or subsequently to the execution of the will may be shown to illustrate the condition of the testator's mind, still the controlling question to be determined, where testamentary capacity is the issue, is whether the testator had sufficient testamentary capacity at the time of executing the will. *Terry* v. *Buffington,* 11 *Ga.* 337 (56 Am. D. 423); *Brown* v. *Kendrick,* 163 *Ga.* 149, 168 (135 S. E. 721); *Hillyer* v. *Ellis,* 171 *Ga.* 300 (155 S. E. 180); *Fehn* v. *Shaw,* 199 *Ga.* 747, 754 (35 S. E. 2d, 253).

To sustain the verdict refusing probate, the caveator relied on the testimony of three expert and five non-expert witnesses. None of the three physicians saw the testator on the day when the will was executed. Dr. Wood, the principal expert witness, who attended the testator in his last years, did not see him between March, 1945, and October, 1946—a period of about one year prior to the date of the will and about six months after. Dr. Fulgham did not see him during the same period. Only one non-expert witness testified that he saw the testator on May 14, 1946. The expert testimony was, in general, that the testator's mental condition was "largely due to old age." Dr. Wood testified: "I would say, in my opinion Mr. Spivey was not competent on May 14, 1946. I don't know what amount of mental competence is necessary to qualify a man to make a will." On redirect examination, he testified: "I could not say that on May 14, 1946, Mr. Spivey was incapable of transacting any business, making a will, or any other business—if it was anything that involved any responsibility, I would not think he would be able to do it." Dr. Fulgham testified that he never saw Mr. Spivey when he thought him "capable of transacting business to his advantage." Dr. Griffith testified that

"his mind was decidedly bad," based on past knowledge of Mr. Spivey and his mental condition. No expert testified that Mr. Spivey was at any time "totally bereft of reason." See *Griffin* v. *Barrett,* 183 *Ga.* 152 (187 S. E. 2d, 828). The non-expert testimony most favorable to the caveator was as follows: W. J. Bell— "I would consider his mind less active than it had been." W. D. Stribling—Mr. Spivey would not recognize him in 1945 and 1946, and he would have to tell him who he was. Dr. Middlebrooks, a druggist—Mr. Spivey's mind was bad when he saw him in the hospital in 1945. He had some very lucid moments, then would be absolutely blank. R. R. Spivey—basing his testimony on the fact that the testator had threatened to kill him, once got lost on the place where he was married, once caught his clothes on fire, had to be sent from breakfast several times to put on clothes, and was unable to care for his business—testified that his mind was bad on May 14, 1946, "that day and all days." Frank Spivey noticed Mr. Spivey on May 14, 1946, and his mind was bad that day, and had been for several years prior thereto. This opinion was based on the fact that the testator, once thinking it was nighttime, started to bed around noon, and once got lost on his home place. There was no testimony, by expert or non-expert witnesses, which would have authorized the jury to find that the testator did not possess sufficient mental capacity to "enable him to have a decided and rational desire as to the disposition of his property."

The evidence produced by the caveator on the hearing of this case was no more sufficient to show testamentary incapacity and to authorize a verdict in his favor than that dealt with by this court in several cases in which the judgments denying probate were reversed. In *Orr* v. *Blalock,* 195 *Ga.* 863 (25 S. E. 2d, 668), the caveator offered a number of non-expert witnesses who testified to having seen the testator at various times before and after the will was executed, but none who saw him when the will was actually signed, and who testified that when they saw him, he was mentally incapable of having a rational desire as to the disposition of his property. In *Scott* v. *Gibson,* 194 *Ga.* 503 (22 S. E. 2d, 51), a witness testified: "When I come home she was washing clothes, and she said she felt bad, and come over and fell down on the porch, and she was sick from then until she died. She was in a bad condition when the women carried her in the house. She continued

to grow worse so that she did not know what she was doing. . . I saw her daily and she grew steadily worse day by day. I would speak to her every day and she did not answer, but only lay in bed. I saw her daily from the time she got ill until she died, and during that period she was not in a condition to know what she was doing." The court said: "Such testimony can not break down the positive testimony of the subscribing witnesses *at the time the will was executed.*" (Italics by the court.) In *Brumbelow* v. *Hopkins,* 197 *Ga.* 247 (29 S. E. 2d, 42), the will was executed December 7, 1940. A physician who examined the testator on December 5, 1940, testified: "I did not give him the health certificate, because his blood pressure was too high and he had arteriosclerosis, hardening of the arteries. . . The arteriosclerosis that he had was pretty bad. . . I talked with him. I would say that his mind was not good either time he visited my office." A number of non-expert witnesses were introduced, who gave it as their opinion that the testator's mind was unsound, and related many circumstances as the basis for their opinions. The court held that lack of testamentary capacity was not shown by the non-expert witnesses, whose opinions that the mind of the testator was unsound were not based on circumstances to authorize such conclusion; and that the testimony of the physician failed to show the lack of mental capacity necessary for the thing at hand, to wit, the making of a will. In *Peavy* v. *Crawford,* 192 *Ga.* 371 (15 S. E. 2d, 418), a witness testified: "Having known Mrs. Crawford before, and observing her at that time, she was not capable of disposing of her property. I don't believe she recognized what she was doing at that time." (Witness referred to the day the will was signed.) "Mrs. Crawford did not recognize me . . the day before, and didn't recognize me after that until about a week afterward. At that time she was very ill. I spoke to her when I went in the room, but she didn't reply—didn't say anything at all to me. She was just lying there, and sometimes she didn't speak at all." The court said: "The witness was in the room only a part of the time. She testified to no conversation with the testatrix, and gave no facts on which to base her opinion that Mrs. Crawford was not capable of disposing of her property. Such testimony can not break down the positive testimony of the subscribing witnesses that, *at the time the will was executed,* the testatrix was capable of making a testa-

mentary disposition of her property. See *Hillyer* v. *Ellis*, 171 *Ga.* 300 (155 S. E. 180); *Hill* v. *Deal*, 185 *Ga.* 42 (193 S. E. 858). The evidence demanded the verdict." For similar reversals, see *Griffin* v. *Barrett*, supra; *Martin* v. *Martin*, 185 *Ga.* 349 (195 S. E. 159); *Dutton* v. *Nash*, 186 *Ga.* 292 (197 S. E. 637). For cases in which this court has affirmed the direction of a verdict in favor of the propounder when testamentary capacity of the testator was in issue, see *Walters* v. *Walters*, 151 *Ga.* 527 (107 S. E. 492); *Mason* v. *Taylor*, 162 *Ga.* 149 (132 S. E. 893); *Cook* v. *Washington*, 166 *Ga.* 329 (143 S. E. 409); *Fehn* v. *Shaw*, supra.

The mind of the testator could have been "bad," or such that he could not "transact business to his advantage," and still he could have possessed sufficient intelligence to enable him to have a "decided and rational desire as to the disposition of his property." The opinions of the non-expert witnesses that the mind of the testator was "bad" were not based on such facts and circumstances as to authorize the conclusion that he was totally devoid of the capacity to have a "decided and rational desire as to the disposition of his property." The test is whether he had such mental capacity at the time the will was actually executed. The testimony of both the expert and non-expert witnesses was insufficient to overcome the positive testimony of two of the subscribing witnesses that *at the time the will was executed* the testator apparently had testamentary capacity. The evidence therefore demanded a verdict in favor of the propounder, and the trial court erred in denying the motion for new trial.

*Judgment reversed. All the Justices concur, except Jenkins, C. J., not participating on account of what appears to be an actual or moral, though not technical, disqualification, and Wyatt, J., who took no part in the consideration or decision of this case.*