Where testamentary capacity is the issue, the controlling question to be determined is the condition of the mind at the time of the execution of the will. As tending to illustrate the mental condition at that time, evidence of such condition at other times may be received, but where it is sought to establish testamentary incapacity by such evidence, it does not controvert the positive testimony of the subscribing witnesses unless it would be proof of testamentary incapacity at the time the will was signed.
(a) Applying the above principle to this case, there was nothing in the evidence produced by the caveators which would have authorized a finding that at the time of the execution of the will the testator did not possess testamentary capacity, and the court did not err in directing a verdict for the propounder.
 No. 15248. SEPTEMBER 8, 1945.
This case was previously before the Supreme Court. Shaw v.Fehn, 196 Ga. 661 (27 S.E.2d 406). *Page 748 
The trial in the instant case was confined to the sole question of testamentary capacity. At the conclusion of the evidence the court directed a verdict for the propounder.
The will of Martin Fehn provided for three legatees, his wife Magdelena and his two sons Joseph and Michael. To Joseph, the older son, he gave one dollar; to Michael, the younger son, he gave one half of his money in banks; and to his wife Magdelena, the rest of his property. The two sons filed a caveat.
It was uncontradicted that the testator, Martin Fehn, had been married three times. His first wife, the mother of the two sons who were the caveators, died in 1906. A few months later he married Louise Fehn. He was injured in an automobile wreck in January, 1938, and his second wife with whom he had lived since 1906 died April 5, 1938. In October, 1938, he received a second injury to his spine. On November 10, 1938, he married his third wife, Magdelena. He executed his will on March 20, 1939, and died May 1, 1941.
W. M. Thompson, a witness to the will, testified in part: Martin Fehn came into the office of the witness to pay some fire insurance. After making the payment Fehn said he wanted a named person to witness his will. Upon being told that the person was out, Fehn said, "You are a younger man, and I would rather have you witness it." The witness related the circumstances under which the will was executed, and stated: "In my opinion, Mr. Martin Fehn was of sound mind and of disposing memory at the time he made the will and signed it."
Reavis L. Jones, another witness to the will, testified that in his opinion the testator was of sound mind, and further that the third witness whose signature was identified died on February 25, 1940.
Fred Farris testified: Before Martin Fehn was injured in the automobile wreck he was an excellent mechanic and a man of good judgment. A change came over his mind after the death of Louise Fehn. He hardly seemed like the same man. He was forgetful, easy to get mad, high-tempered and got to drinking heavily. The witness thought "it was just . . an old man gone bughouse." In an ordinary conversation he would be talking about one subject for a little while and then jump off to another. The last time the witness saw the testator, five or ten days before he died, he was in worse shape mentally than he had ever seen him. *Page 749 
"I don't know what his mental condition was on the 20th of March, 1939. . . I could not say I saw him in March."
Mrs. A. Harrold testified: She noticed a change in Martin Fehn's mental condition after the death of his second wife. He began to break and was not himself at all. When he talked he would start on a conversation and go around in a circle and get all balled up and did not know where he was, and he did not know who he was talking to, and yet he had known the witness for a long while. After the witness would tell him who she was, probably ten or fifteen minutes later, he would ask who she was. The last time the witness talked to him was after he was married to the other Mrs. Fehn and he was getting from bad to worse. Part of the time he recognized the witness and part of the time he did not. The witness was not in Fehn's home very much after his third marriage. She would not say his mind was very sound; would not think Fehn had enough judgment to know what he was doing in his business, to be a good judge for himself. He was in his seventies. He could talk all right and did talk, but it just did not make sense. He would be talking about things the witness knew about, and then he would talk about other things that she knew nothing about. The time that Fehn got worse was after he married Magdelena. It started about the time of Louise Fehn's death and got worse as long as the witness knew him. The last time that the witness saw him was about two weeks after he married Magdelena, and his condition then was worse. The witness did not know what his mental condition was on March 20, 1939, about four months later.
Mrs. T. B. Green testified: She noticed a difference in Fehn's conversation and his mental condition after the death of his second wife. He would be talking on one subject and then change off and start on another. He didn't carry on a connected conversation, and his condition was noticeable. It got worse. He didn't recognize the witness or her children, and before that he knew them. The last time the witness saw him was about six months after Louise Fehn's death; she was there one time after he married Magdelena. After the death of Louise until the last time the witness saw him, he was "unsound of mind because he did not know his right mind." The witness did not remember the date when he became of unsound mind. *Page 750 
Sergeant John Caldwell testified: After the death of Louise Fehn the testator seemed more childish. One time the witness would go over to see him to borrow something, and he would say, "All right," and then sometimes the witness would go and ask the same thing, and he would blow up and raise sand. The witness did not know what his condition was on March 20, 1939.
Joe Bauml testified: There was a lot of difference in Fehn after the death of his second wife. He would get all mixed up in his conversations, and it looked like he did not have his right mind. He could not carry on a connected conversation. He did some drinking, and he never did that before. The witness saw him a month before he died. From the time of his last marriage until about a month before his death, the witness saw him about every two weeks. "His mental condition was noticeable during all of this time. . . Mr. Fehn's mental condition on March 20, 1939, was pretty good, and we would go to the Turnverein and play cards, he was all right then, that was in 1939, I did not notice anything wrong with him."
Mrs. E. C. Caldwell testified: After Louise died Fehn's mind was not good any more. He would ask the husband of the witness to do some work for him, and her husband would do it just like Fehn told him to, and then Fehn would bawl him out. Fehn would change his mind every few minutes. He could not carry on a connected conversation. He would change from one subject to another right in the middle of a conversation and could not recognize people that he had known before his wife died. The witness did not know whether his mind got better or worse after he married Magdelena, but thought it got worse because he just wandered around about the place. When the witness was asked if she would say that the testator was not sufficiently mentally capacitated to know and understand what he was doing when he undertook to do anything because of his changing his mind so much and not talking about anything except his houses and moving people out of them and being dissatisfied with the work that her husband did for him — she answered that she did not know. Likewise, when asked if she thought that the testator "would understand and know about disposing of his property if he was going to make a will," the witness replied: "I don't know if he would be mentally capacitated to make a deed to property. I *Page 751 
don't know if he was capable of having intelligent ideas about making a will and disposing of his property."
W. G. Spaulding testified: He could see a difference in the testator's mental condition after his wife's death. He did not seem to be the same. His mind did not seem to be quite as alert as it was before she died. This condition was noticeable in his conversations. He could not stick to one subject for any length of time. He would seem to ramble around and did not make sense.
Dr. Edward T. Newell testified: Martin Fehn first came to the sanitarium January 22, 1938, with a fracture of the first lumbar vertebra. It was necessary to place him in a plaster cast. He remained in the hospital until February 19, 1938. He was seventy-four years old. He came back a second time on October 31, 1938, and remained in the hospital until November 10. He had suffered another injury to the spine. He showed the ravages of having been in a cast for a period of about ten months; and, along with his body, his mind appeared to have gone down in the same proportion as his physical being. A man of the age of Mr. Fehn, having had two different fractures of the spine, and having been kept in a plaster cast for something like nine months, would have a very bad effect physically, and he would get poor circulation to the brain, and, if you affect the brain, there is a certain definite proportion along the body. He was much more temperamental the second time, and was harder to control. A man seventy-five years old who has been sick for ten months could be easily influenced, and would not be able to judge business affairs like he might have done ten years before. It is very difficult to say whether Mr. Fehn was able to enter into contracts and attend to his own business at the time he left the hospital. The doctor further stated: "I did not examine Mr. Fehn when he left there with a view of passing on his sanity — I was looking after his bone rather than his brain. . . I do believe he was in such a state that his judgment would not be as good as it had been in previous years. It is a rule, rather than the exception, that at the age of seventy-four it would not be as good as sixty-four, but not every person seventy-four or any other given age is not competent to look after his own business."
Mrs. E. M. Dillon, a nurse, testified: The second time Mr. *Page 752 
Fehn was in the hospital he was harder to control and very anxious to leave as compared to the first time, and his mental condition seemed to be weaker.
Joseph Fehn, one of the caveators, testified: When a young man he lived in the home with his father and his stepmother, Louise Fehn. The relationship between him and his stepmother was just about perfect. The testator and Louise Fehn had no children. The caveator and his brother Michael were the only children of their father. The caveator went to Texas in 1911. He returned at the request of his father when the latter had an automobile wreck in January, 1938. The testator's mental condition was pretty good at that time. He said that, if anything happened to Louise Fehn, he wanted the caveator to come and live with him and take care of him and said, "If you will come, . . everything will be yours." When the caveator came back, his father and stepmother were both in the hospital. His stepmother died on April 5, 1938. Sixteen rental houses besides the residence are involved in this estate. The block numbers are seven and eight, and there are some scattered lots. All this property was acquired during the time that Martin Fehn and his second wife were working together. That is the property Louise Fehn claimed to own while she was in life, and is the same property that she was in possession of at the time of her death. The houses were badly in need of repairs when the caveator took charge of them. All the money which the caveator collected from rents went in the repairs. The testator got able to go around toward the end of the year. He then started going into Chattanooga and visiting the Turnverein Club and Rathskeller where he met Magdelena, the woman he afterwards married. He did not drink until he started to go back to the Rathskeller, after which the caveator noticed a change in his mental condition. He seemed to be getting more childish. Everything was going along fine when one day the testator refused to come home. The caveator asked, if he had done anything wrong, and the testator said: "No, I am going to get married to another woman, and I will give you ten days' notice to get out of the place." The caveator's father gave him $500 when he moved out of the house to pay some of the expenses incurred in moving back from Texas. The testator married Magdelena in November, 1938. He was in a plaster cast at the *Page 753 
time and was lying in bed. He was 76 years old. He died in 1941.
The caveators introduced in evidence without objection the joint will of Martin Fehn and Louise Fehn, dated January 6, 1933, which was probated as the will of Louise Fehn. The joint will provided in part: "Item 2. In the event of the death of either of us, we each desire and will that all our property . . shall go to the survivor, who shall have . . . full and complete title thereto, and this shall include all our possessions, whether held jointly or severally, with the right to use or dispose of the same in any manner. Item 3. It is our mutual desire and will that after the death of both of us, whatever shall remain of our said property, undisposed of during our natural lives, shall go to Joseph Fehn, . . and Michael Fehn, . . both being the sons of the testator, Martin Fehn."
At the close of the evidence the court on motion directed a verdict in favor of the propounder. The exception is to an order overruling the caveators' motion for new trial as amended.
The caveators offered a number of non-expert witnesses, who testified to having seen the testator several months before the will was executed, and stated that he began to break after the death of his second wife and was in bad condition mentally. The reasons given to support this non-expert testimony were that the testator was old, crippled, forgetful, easy to get mad, high-tempered, got to drinking, was more childish, frequently changed his mind, rambled in his conversations, jumping from one subject to another, and that sometimes he did not recognize the witnesses, although they had associated with him many times theretofore. None of the witnesses gave testimony sufficient to establish that the testator was mentally incapable of having a rational desire to dispose of his property. One witness thought that "it was just . . an old man gone bughouse." Another witness did not think he had enough judgment to know what he was doing in his business. These witnesses stated that they did not know what his mental condition was on March 20, 1939, the date when the will was executed. A third witness said that after the death of his second *Page 754 
wife, Louise, which was some eleven months before the will was executed, he was "unsound of mind because he did not know his right mind." This witness added that she did not remember the date when he became of unsound mind. Still another witness thought his mind got worse because "he just wandered around about the place," but, when asked the direct question, the witness stated that she did not know whether he was capable of having intelligent ideas about making a will and disposing of his property. The only witness for the caveators who testified that he saw the testator the month when the will was executed said that his mental condition on March 20, 1939, was pretty good, and he was all right at that time. While a physician testified concerning the testator's physical condition several months before the will was executed, he stated that he did not examine the testator from a standpoint of sanity, and declined to say whether or not he had sufficient mental capacity to enter into contracts and attend to his own business.
Where testamentary capacity is the issue, the controlling question to be determined is the condition of the mind at the time of the execution of the will. As tending to illustrate the mental condition at that time, evidence of such condition at other times may be received; but where it is sought to establish testamentary incapacity by such evidence, it does not controvert the positive testimony of the subscribing witnesses unless it would be proof of testamentary incapacity at the time the will was signed. Hillyer v. Ellis, 171 Ga. 300 (155 S.E. 180);Hill v. Deal, 185 Ga. 42 (193 S.E. 858); Scott v.Gibson, 194 Ga. 503, 504 (22 S.E.2d 51); Orr v.Blalock, 195 Ga. 863 (25 S.E.2d 668); Brumbelow v.Hopkins, 197 Ga. 247 (2) (29 S.E.2d 42); Lyons v.Bloodworth, 199 Ga. 44 (33 S.E.2d 314); Davis v.Aultman, 199 Ga. 129 (33 S.E.2d 317).
Applying the above principle to the evidence in this case, there was nothing in the testimony taken as a whole, including that of the physician, which would have authorized a finding that when the will was executed Mr. Fehn did not possess testamentary capacity.
While the evidence showed that the testator devised his property to a third wife after having previously executed, on January 6, 1933, a joint will with his second wife, who was the stepmother *Page 755 
of the caveators, which will provided that all of their property should go to the survivor, and, if anything remained after the death of the survivor, it should go to the caveators, this was not sufficient to show such an unreasonable disposition of the property as would authorize the jury to find that the testator was mentally incapable of making a will.
Accordingly, the trial judge did not err in directing a verdict in favor of the propounder.
Judgment affirmed. All the Justices concur, except Bell, C.J., Jenkins, P. J., and Head, J., who dissent.