1. Under the law and the evidence, a finding was demanded that the testatrix was possessed of the requisite testamentary capacity in executing the will in question, and did so freely and voluntarily and without any undue influence being exercised upon her, and, accordingly, the court did not err in directing a verdict for the propounder.
2. After both sides had closed and the presiding judge had announced that he would direct a verdict for the propounder, there was no abuse of discretion in refusing to reopen the case to allow the caveator to be recalled and answer a proposed question, the witness having already been examined at considerable length and no reason appearing why he could not have been asked the question when on the stand.
 No. 16607. May 11, 1949.
Reuben T. Pitts, the nominated executor under the last will and testament of Lucy Pitts Whitfield, filed in the Court of Ordinary of Baldwin County a petition alleging her death and seeking to probate her alleged will in solemn form. George Turner Whitfield, her husband, filed a caveat. By agreement of both sides the proceeding was appealed to the Superior Court of Baldwin County, where the caveat was amended, and as amended it was alleged: (a) The instrument was not a will and appears not to have been executed in proper form. A copy of the will was attached and was in the following language: "I, Lucy Pitts Whitfield, do hereby make my last will and testament to wit: as followers [sic], I leave to my husband, George Turner Whitfield, all of my real estate and personal property for his natural lifetime — under the conditions that my sister, Mary Pitts Binford, have a home there her lifetime if she so desires. After the death of my husband, George Turner Whitfield — I want to divide my real estate equal between the following, to wit, my brother, Reuben T. Pitts, and my nephew, A. B. Pitts. *Page 260 
Leaving A. B. Pitts his part of my real estate, that includes my home house. I hereby appoint my brother, Reuben T. Pitts, administrator, without bond or any other court proceeding, except what is required by law." The will was signed "Lucy Pitts Whitfield," and while it had no regular attestation clause, it bore the following language after her name: "Witness before us this 1st day of Sept. 1945," and after this appeared the names, Mary W. Webb, M. E. Webb, and W. F. Williamson. Other grounds of the caveat as amended were: (b) The will practically excludes the husband, a man about eighty years of age, who had lived happily with the testatrix for a great number of years, the will leaving him only a conditional joint interest in a life estate in the property therein referred to. (c) The will was not executed freely and voluntarily, but by reason of the undue influence and persuasion of the brother, sister, and nephew of the testatrix, the principal beneficiaries under the will. (d) As set out in the caveat and as appears from the instrument purporting to be the will of Lucy Pitts Whitfield, it is unnatural and unreasonable — that the husband had been chiefly instrumental in accumulating and preserving the property referred to therein, and had, by his labor and sacrifice, purchased the property and merely, for convenience and by agreement, had taken the title in her name, but she had disposed of the property to strangers who had never contributed anything in labor, time, or sacrifice in accumulating, preserving, and taking care of the estate. (e) The testatrix was old and infirm and weak physically and mentally and without mental capacity to reasonably and intelligently dispose of the property at the time she executed the said instrument, and she was mentally unable to execute the same. (f) The estate consists of farm implements of little value and a horse and a mule and a tract of land of approximately 232 acres, more or less, in the 319th district of Baldwin County, Georgia, approximately 40 acres of which are cultivatable, purchased by the caveator from Reverend Zedekiah Spear, and the title to which was by agreement and for convenience placed in the name of the testatrix; that he had borrowed on the land $900 and paid the debt from his and his wife's work and labor and sacrifice and savings and sale of timber therefrom, the property representing his life's accumulations, and he is under the will left practically without *Page 261 
sufficient support in the conditional interest given him, if the instrument is allowed to stand, as he is not physically able at his age to farm, and the rents, issues, and profits therefrom above taxes are of little or no value, and the effect of the said instrument is to disinherit him and leave him without any means of support and any benefits from the said estate. (g) The caveator did not know of the execution of the will until notified by Reuben T. Pitts after the death of the wife and when the caveator proceeded to take charge of the property as the sole heir at law and owner thereof as her husband.
Upon the trial the evidence was as follows: Willard F. Williamson testified by deposition for the propounder as follows: "I have lived here in Baldwin County all my life. This is my signature as a witness to the instrument presented to me purporting to be the original will of Lucy Pitts Whitfield. The signature of the maker is that of Lucy Pitts Whitfield. I recall the execution of that instrument. Milton Webb and his wife — Milton wrote the will — brought old lady Lucy up to my house in his car, and we all witnessed her signature on the back porch. She signed the will first, and then we three signed it, that is, Milton Webb, his wife and myself. All of the witnesses and the testator were present when each signed. I have known Lucy Pitts Whitfield all my life, since I got big enough to go around and see negroes . . 25 or 30 or 40 years, something like that. As to her mind, I didn't see anything the matter with her. She looked like she had as good sense as she ever had in her life. It was a normal transaction. . . There was nothing that led me to consider there was any irregularity connected with the signing of the will. . . The will was not read in my or her presence. . . I don't remember who signed the will first as a witness. I know I didn't sign it first. . . I remember I stated to you I didn't remember anything about it and would see you [Mr. Sibley, counsel for caveator] later. I had to get together because I sign a lot of wills, and it slipped my mind. . . After we got together and found out what we did and where it was at and everything, of course, we cleared it up and I knew what happened. By `we' I mean Milton Webb and his wife."
Milton E. Webb testified by deposition for the propounder as follows: "I have been knowing her [the testatrix] a pretty good *Page 262 
while. I would say in the neighborhood of 18 or 20 years. Referring to this instrument shown me as the purported will of Lucy Pitts Whitfield, my wife wrote it, I helped. This here is Lucy's own wording nearly to my best recollection. To the best of my recollection she came here. Nobody brought me here that I know of. My best recollection, she said she came here for me to help her with her will. This is my wife's handwriting. I think we fixed this will right here, wrote it, I almost know we did. This is practically Lucy's own wording. I just now looked down through it. She indicated what she wanted put in the will, and we drew it for her. I don't remember whether I read it back to her. All I know is I put it down like she said put it down. . . Lucy Pitts Whitfield signed it. Whether she signed it at Mr. Williamson's house is what I can't understand. I haven't got that straight yet, whether Lucy signed out here or there. I couldn't say positively, and that is something I have been doubting ever since I talked with Erwin [counsel for caveator], whether we signed the thing here or up yonder. I think we signed it up there. That is my best recollection. Willard said we signed it up there after he finally found it. She signed it first. I should say we then signed as witnesses because I have made a lot of papers in my life and I never signed ahead of the signer. I am not a justice of the peace now but used to be. . . That is my signature to the will and my wife's signature and that is Mr. Williamson's and that is Lucy Whitfield's. I couldn't swear to the signing, whether she signed here or up yonder, but I know we went up there, and if it hadn't been for one special thing I don't know that I would remember that. These negroes we went by, she made the remark she didn't want them to see her, said George would see her and figure she was trying to make a will. That is the only thing I can recall, but I had a faint recollection in my mind all the time that we went up there, and which we did. . . As far as I could see Lucy Pitts Whitfield was in her right mind when she was here. I would say she was capable of executing a will. She appeared normal. There was no one that I know of that was influencing her one way or the other in making this will. There was not anybody else present here that I remember. She seemed to have her mind made up when she came here as to what she wanted *Page 263 
to put in the will. That is her will. That is almost word for word what she said. I am satisfied she knew what she was doing. It was put down just the way she wanted it put. . . As far as I know, George and Lucy lived together happily as husband and wife. . . I don't know what became of the will. . . I think she [his wife] turned it over to Miss Bertie Stembridge [after the death of the testatrix]. Lucy said she didn't want George to know she was going to make a will. I just remember that since you and myself were talking down here in the road. If it hadn't been for that I don't know that I could ever remember it. When you talked to me about it I didn't remember distinctly the circumstances at all. I did not afterwards discuss it with my wife and Mr. Williamson, but got to thinking about it. I have never discussed it with them to come to any conclusion as to where it was drawn. I am a brother-in-law to Mr. Williamson. . . If my life depended on it, I couldn't tell who first signed it as a witness. I don't remember who signed it second. I notice down here I am second, but I couldn't have sworn to it."
Mrs. M. E. Webb testified by deposition for the propounder as follows: "I am a sister of Mr. W. F. Williamson. The signature on this paper, purporting to be the will of Lucy Pitts Whitfield, of Mary W. Webb is my signature. That is my writing. I recall some of the circumstances of the signing of this will. Lucy Pitts Whitfield came to my home here and I was not here when she came. I had been somewhere, and when I got here she was sitting out there in the buggy. . . Nothing happened then that I can specially say except she talked a while in general, and then she said she wanted to make her will. I wrote her will. That is my writing. I came in the house and got paper and wrote whatever she said write. I wrote it like she said write it just as near as I could. She seemed finally convinced that that was what she wanted to do with her property. I just copied it like she told me. I remember I asked her, `How come you don't leave it to Uncle George?' That was before I ever started writing the will. She said because she wanted him to have a home as long as he lived, and if she left it to George, he would sell it and would not have anywhere to stay, and she wanted her sister to have a home. I remember saying that. . . I *Page 264 
don't recall whether I read the will back to her when I got through writing it, but we talked along and wrote along and read along and discussed it along as she was telling me, because I would kind of say, `I want to know how to word that.' I would try to figure it out. . . I am positive in my own mind that this will represents what Lucy Pitts Whitfield wanted to do with her property. I think that is as near what she wanted to do with it, from what she said and what I tried to write. . . She said she wanted him [the husband] to have a home as long as he lived, and if she left it to him he would not have it. I don't know how she worded it, but that is what I got in my mind from what she said. . . My husband, Mr. M. E. Webb, and Lucy Whitfield and I all got in the car and went to Mr. W. F. Williamson's house. I don't know whether I signed it up there or not. . . I positively don't know, but we went there to sign it, and my recollection is I guess we did sign it there. I don't recall whether I signed it here and let Lucy sign and carried it there and let Willard sign or we signed there. . . If I dated the will September 1, 1945, I dated it correctly. . . I couldn't tell who signed it first. I reckon she signed it first. We witnessed her signature. . . I have been knowing Lucy Pitts Whitfield 35 or 40 years. . . As far as I know, she was in her right mind when she came here, looked like it was as good as it ever was. I couldn't see nothing wrong with her mind. As to considering her perfectly normal, as far as her mind is concerned, I didn't see nothing the matter with her. I don't reckon I talked to her an hour. I talked to her a little while out there and went in to make the will. Maybe it was an hour. . . After we had signed the instrument she left it with me. . . She would not take it herself, but asked me to keep it until she called for it or until she died. . . After Lucy died I took the instrument which I drafted as Lucy's will to Miss Bertie Stembridge and gave it to her. . . I told Reuben Pitts I had the will. I don't know that I told him she had left the property to him. . . She dodged in the automobile after making the will and didn't want the Bonners to see her. . . When the will was drawn I think Milton was here, and we were sitting in this room. I am almost sure Milton was here. He helped me a little. I would say, `How would you write that?' As well as *Page 265 
I remember, Milton helped to try to word it and put Lucy's wishes together. I really don't recall now whether Lucy signed it first and we witnessed it or she signed afterwards or where it was the signatures were made. I don't know whether we signed it her and went to Willard's and he signed it or whether we all signed it up there. I am not going to say which because I positively don't know."
At this point counsel for the propounder introduced in evidence the purported will of the testatrix hereinabove set out.
George Whitfield, husband of Lucy Pitts Whitfield, testified as follows: "She [the testatrix] died the 30th of June, 1947. A. B. Pitts was living at the time of my wife's death. He was her nephew. Mary Pitts Binford, her sister, was living at the time of my wife's death. There was no will besides this instrument here that had been offered as her will that I know of. Reuben T. Pitts is a brother of my wife. . . Since December, 1911, I lived with my wife as her husband until her death on June 30, 1947. I lived happily and contentedly with her, only at times she would get off, have spells. So far as I am concerned, I lived happily with her. The spells I speak of I call brain storms. I told her I should have my name put on the deeds as we bought the place together. Then she got to hollering and carrying on. She said, `I will burst your brains out.' I got Carrie to send for Reub, and she would not let anybody come. We got along all right until I spoke of having my name put on the deeds. I go to court and have my name put on the deeds. Then she flew up. That was in the last few years before she died. She was nervous and sickly. She has been sick a long time. I sent for Reuben to come. Reuben had pretty good influence over her. She listened to what he said, but she would not let him come to her that day. . . I did not know that Lucy had made this will. I heard she made this instrument I think it was about two months as near as I can tell. I paid up every bill, every debt that she owed. I gave Reuben $150 to pay a bill up here to the bank, at the Jones County Bank. I didn't know how much it was, but I gave him $150. I waited more than a month and he didn't bring me the note. So he told me it was not any trouble to go there. He just left the money there. So I went to Mr. Smith, and the note was $134.85. That *Page 266 
was on Monday. I paid up the balance of the note, and then they told me about this will. He told me about this will Saturday. It had been gone about two months. . . I paid up the balance of the funeral expenses after the burial society had paid on it. . . A. B. Pitts lives on the place with me. . . We got $12.50 old age pension. That is every penny I have lived on. . . I don't think the rent or profits or crops from that land are able to take care of me for my life. I don't know how long I will live. I am getting nothing for it now, not a God's thing, not a penny. I am just living on that $12.50 a month. That is all I have got. . . As to my wife's physical and mental condition along in September, 1945, when this instrument was made, she had these brain storms. I call them brain storms. I would not say she was foolish, but I would say she had brain storms, fly off the handle all the time with me. Afterwards she would apologize, come and tell me she was sick while she did it. . . My wife always handled the business. She was the one that went in the bank and borrowed the money to make a down payment on this land. I was not on the note. She worked in the fields, plowed. I took as much care of the house as she did. I worked, too. My wife's sister was living there with us for some little time before my wife's death. She is the same one that she provided in this will that she have a right to live on there. . . Talking about her property, it was just as much mine as it was hers. I had confidence. I didn't have my name put on the deeds, that was all. . . The brain storms I spoke of that she went into would last sometimes about 15 or 20 minutes. Then she would be all right again. I would not exactly say she would have sense to make a will when she was not in one of these brain storms. I don't know what was wrong with her then no more than she was very highstrung, fly off the handle too quick. I never said she was crazy. She knew what she was doing. I think she knew what she was doing when she had these brain storms. A whole lot of times I think it was just meanness. She would throw one of these fits to be mean, but she knew what she was doing. I don't think she knew what she was doing when she made the will, because we bought together. She should have had my name on the deeds or either given me half of the place, and she could have done what she pleased with the other half. *Page 267 
If she had had the right sense she would have done that. As to my thinking she was using bad judgment, all of us do. I told you I didn't think she was crazy. . . With reference to whether anybody made her make that will, I can't say it is a fact, but I can tell my belief. Reuben told me three or four times, `Lucy asked me to help her make a will, and I would not make it because she might think I wanted her to give me something.' That made me believe he had something to do with it. She would do anything he asked her to do. He would do anything she asked him. They were just that way. My reason is based on the fact that she and her brother were very close to each other. . . I think he had something to do with it because he told me he was not going to help her, because he said he was not going to do it. That made me believe he did do it. That is the only ground I have got. When my wife had these brain storms sometimes she was crazy and a whole lot of times just mean."
Upon the conclusion of the evidence, the court directed a verdict for the propounder in favor of the will and judgment was entered accordingly. The caveator filed a motion for new trial on the ground that, under the pleadings and the evidence, there were issues of fact which should have been submitted to a jury; and the evidence introduced would have authorized a different verdict than that directed by the court. By amendment the following special grounds were added: 1. The court erred in refusing, after both sides had closed, but before the verdict was directed, to allow the caveator to be recalled and asked the following question: "What was the mental condition of your wife on September 1, 1945, as appears to have been the date of this instrument?" The court was then and there informed that the witness would answer that her mental condition was the same about which he had testified as being mentally incapacitated, as having brain storms and not being rational when it came to the matter of the question of the real estate, and it is contended that the court erred for the following reasons: (a) The proposed testimony tended to contradict and refute the testimony of the witnesses for the propounder that the executrix was capable of making and executing the instrument as a will. (b) It sought to clarify and support the contention of the movant that his wife *Page 268 
was mentally incapacitated as having a monomania on the question of the disposition of the said property in the said instrument. (c) (Substantially the same as the foregoing.) (d) It tended to support the contention of the movant that the testatrix was under the influence of her brother, Reuben T. Pitts, the propounder and beneficiary in the will, as to the matter of the disposition of the said property. 2. The direction of the verdict for the propounder was error and a new trial should be granted, because the evidence for the propounder did not make a prima facie case for probating the will, the witnesses to the instrument being doubtful as to the time and place of the signing by them, and whether or not the testatrix had signed before each of them had signed, and the said instrument appears to have been written by one of the witnesses, Mrs. Mary W. Webb, and it did not appear without contradiction that it had been read to the testatrix after it was purported to have been written; that the instrument appears on its face to be defective, in that it did not dispose of all of the property referred to therein, but created an intestacy as to the remainder interest in the personalty, and it shows on its face that it was unnatural, in that the testatrix disposed of most of her property to strangers in preference to her husband, giving him only a life estate in the land upon the condition that his sister-in-law, Mary Pitts Binford, should have a home for her life, which provisions in the instrument created issues as to mental capacity and undue influence. 3. The direction of the verdict was error in that the evidence showed that the instrument was not executed freely and voluntarily, fails to show that the decedent was mentally capacitated, or that the instrument was executed in the presence of the said purported witnesses who signed the same prior to each and all of them having witnessed the same, and it was not proved that the instrument was read to the decedent after it had been written and that she knew of its contents. 4. The evidence showed that the propounder had not carried the burden of proof and did not show that the instrument should be probated as a will, and the court should have refused probate, and the verdict and judgment should have been in favor of the caveator.
The exception here is to the judgment overruling the amended motion for new trial. *Page 269 
1. One of the attacks upon the direction of the verdict here is that there was no sufficient attestation clause and the subscribing witnesses were not able to testify as to the time and place of the execution of the will. "A paper testamentary in its nature does not require for its due execution, an attesting clause declaring it a will, and reciting its execution according to the terms of the statute, pointing out how wills shall be executed. If it be subscribed by the testator, in the presence of the witnesses, and be attested and subscribed by them in his presence, it is sufficient." Deupree v. Deupree, 45 Ga. 414,416 (2). Redfearn, Wills and Administration of Estates, 100, § 77. The formalities of execution are prescribed by the Code, § 113-301, as follows: "All wills (except nuncupative wills) disposing of realty or personalty shall be in writing, signed by the party making the same or by some other person in his presence and by his express direction, and shall be attested and subscribed in the presence of the testator by three or more competent witnesses." As ruled in Webb v. Fleming, 30 Ga. 808
(2) (76 Am. D. 675): "It is not necessary that the subscribing witnesses should sign in the presence of each other; it is sufficient if each signs in the presence of the testator." In Huff v. Huff, 41 Ga. 696 (2), it was ruled: "The law provides no special formalities about the witnesses to a will; it is sufficient if they attest and subscribe the will in the presence of the testator; the law implies the request in the consummation of the act, and no special request by the testator is necessary." The will before us bears a signature which all the subscribing witnesses testified was affixed in their presence by Lucy Pitts Whitfield. While two of them could not remember the order in which all signatures were made, each testified that she signed in his presence and that he signed as a witness. Two testified that she signed first. One of them, a county commissioner, testified: "I recall the execution of that instrument. Milton Webb and his wife — Milton wrote the will — brought old lady Lucy up to my house in the car, and we all witnessed her signature on the back porch. She signed the will first, and then we three signed it, that is, Milton Webb, his wife and myself." *Page 270 
Thus the legal formalities of execution are shown to have been fully met.
It is contended that the testatrix did not know the contents of the will. The Code, § 113-305, provides: "In all cases, a knowledge of the contents of the paper by the testator shall be necessary to its validity; but usually, where a testator can read and write, his signature, or the acknowledgment of his signature, shall be sufficient. If, however, the scrivener or his immediate relations are large beneficiaries under the will, greater proof shall be necessary to show a knowledge of the contents by the testator." The greater proof, which is necessary where immediate relations are large beneficiaries, does not require that the evidence shall be conclusive but will be sufficient if strong.Harris v. Harris, 53 Ga. 678, 684 (6). Two of the subscribing witnesses testified that the will was written as directed by the testatrix, and the evidence shows that her wishes were carefully and thoroughly discussed in the process and expressed in the will. As testified by the scrivener, who was one of the witnesses, "I don't recall whether I read the will back to her when I got through writing it, but we talked along and wrote along and read along and discussed it along as she was telling me, because I would kind of say, `I want to know how to word that.'" There was no evidence that the testatrix did not know the contents of the will, and the above-stated testimony establishes that she did.
It is also contended that the evidence did not demand a finding that the testatrix had sufficient mental capacity to make a will. "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and of affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." Slaughter v. Heath, 127 Ga. 747
(1) (57 S.E. 69, 27 L.R.A. (N.S.) 1); May v. May,175 Ga. 693 (2) (165 S.E. 617); Manley v. Combs, 197 Ga. 768,779 (4) (30 S.E.2d 485). The testamentary capacity is to be determined by the condition *Page 271 
of the testator's mind at the time he executed the will. Martin
v. Martin, 185 Ga. 349, 352 (195 S.E. 159); Fehn v.Shaw, 199 Ga. 747, 754 (35 S.E.2d 253). "Upon the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is upon the propounder of the alleged will to make out a prima facie case, by showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and, in making it, acted freely and voluntarily. When this is done, the burden of proof shifts to the caveator."Slaughter v. Heath, supra; Spivey v. Spivey, 202 Ga. 644,648 (44 S.E.2d 224). This burden was carried by the propounder in producing the testimony of the subscribing witnesses, who had known the testatrix for many years, and who testified that she was apparently sane and capable of executing the will, and that she did so freely and voluntarily. "The opinions of the subscribing witnesses to a will, as to the sanity of the testator, are admissible, without stating the facts upon which they are founded." Potts v. House, 6 Ga. 324 (3) (50 Am. D. 329). To the same effect see Scott v. McKee, 105 Ga. 256
(2) (31 S.E. 183); Dyar v. Dyar, 161 Ga. 615 (2), 619 (131 S.E. 535); Morgan v. Bell, supra; Redfearn, Wills and Administration of Estates, 65, § 48.
But it is contended by counsel for the plaintiff in error that the testimony of the caveator made a conflict on the question of the testamentary capacity of his wife, and that such issue should have been referred to the jury. The testimony of the caveator has been fully set out in the foregoing statement of facts and goes no further than to show that she would have "brain storms" from time to time, and that they lasted about 15 to 20 minutes, the outbursts being occasioned by his reference to certain deeds in her name and his insistence that his name should have been included also. In reference to such outbursts he testified: "As to my wife's physical and mental condition along in September, 1945, when this instrument was made, she had these brain storms, I call them brain storms, I would not say she was foolish, but I would say she had brain storms, fly off the handle all the time with me. . . I never said she was crazy. She knew what she was doing. I think she knew what *Page 272 
she was doing when she had these brain storms. A whole lot of times I think it was just meanness. She would throw one of these fits to be mean, but she knew what she was doing. . . I don't think she knew what she was doing when she made the will, because we bought together, she should have had my name on the deeds or either given me half of the place and she could have done what she pleased with the other half. If she had had the right sense she would have done that. . . I told you I didn't think she was crazy." If the above-stated testimony does not precisely show testamentary capacity, the most that can be said of it is that it is contradictory, vague, and equivocal. In that event it must be construed most strongly against and unfavorably to the party appearing in his own behalf. Southern Ry. Co. v. Hobbs,121 Ga. 428 (49 S.E. 294); Castile v. Burton, 200 Ga. 877,882 (38 S.E.2d 919), and cit. So construed, it does not show that the testatrix was lacking in testamentary capacity at the time of the execution of the will. The statement of the caveator that he did not think she had sense enough to make a will is obviously predicated solely on his opinion that such a conclusion must necessarily follow because, not having included his name in the deeds taken in her name, she should have given him "half of the place." To state such a proposition is to state a non sequitur. In any event, the caveator did not pretend to testify as to the condition of his wife's mind at the time of the execution of the will, and testimony as to her mental capacity at other times can not break down the positive testimony of the subscribing witnesses establishing testamentary capacity.Hillyer v. Ellis, 171 Ga. 300 (155 S.E. 180); Hill v.Deal, 185 Ga. 42 (193 S.E. 858); Davis v. Aultman,199 Ga. 129 (33 S.E.2d 317); Fehn v. Shaw, 199 Ga. 747,754 (35 S.E.2d 253).
Nor does the testimony of the caveator show, as contended, that the wife was a monomaniac with respect to the real estate in which he claimed an equity. A showing of hallucinations or insane delusions is essential to proving monomania. Bohler v. Hicks,120 Ga. 800, 804 (48 S.E. 306); Dibble v. Currier,142 Ga. 855 (83 S.E. 949, Ann. Cas. 1916C, 1); Stephens v.Bonner, 174 Ga. 128 (162 S.E. 383). Nowhere in the testimony of the *Page 273 
caveator is it claimed that she suffered from any insane delusion about anything at any time.
Nor does the evidence show the exercise of undue influence or any circumstances from which such conduct might reasonably be inferred. The testimony of the subscribing witnesses establishes conclusively that the will was freely and voluntarily made. The caveator himself testified that "the only ground I have got" was that Reuben Pitts, the brother of the testatrix and a large beneficiary and executor, stated that, in response to the several requests of his sister that he aid her in making a will, he refused to do so because she might think he wanted her to give him something. To say that his statement would authorize a deduction of undue influence on his part would be to indulge a mere suspicion which, of course, can not be done. Hill v.Deal, 185 Ga. 42, 45 (supra). It is also argued that the testimony of the caveator as to the close relationship between the testatrix and her brother, her confidence in him, and her willingness to do what he requested should have required a submission to the jury of the question of undue influence. This testimony shows at most only an opportunity on the part of the brother to impose his wishes upon his sister, and opportunity alone is insufficient to establish undue influence as defined in the Code, § 113-208. Orr v. Blalock, 195 Ga. 863, 866
(25 S.E.2d 668); Norman v. Hubbard, 203 Ga. 530 (2) (47 S.E.2d 574).
It is earnestly contended that, under the facts shown by the record as to the alleged equity of the husband in the real estate standing in the name of the testatrix, his old age, and lack of funds and income, the will is an unjust and unreasonable one. Nevertheless, a finding is demanded that the testatrix possessed the requisite testamentary capacity in the execution of the will in question, and there being no doubt in this respect, the contention of unreasonableness may not legally be made. Dyar v.Dyar, 161 Ga. 615 (7) (supra); Ellis v. Britt, 181 Ga. 442
(3) (182 S.E. 596); Shaw v. Fehn, 196 Ga. 661, 664
(27 S.E.2d 406). It follows from what is said above that the court did not err in directing a verdict for the propounder.
2. After the court had announced its intention to direct, on motion of the propounder, a verdict in favor of the will, but *Page 274 
before the verdict had been signed by the jury, the caveator requested that the case be reopened to allow him to be asked the question, "What was the mental condition of your wife on September 1, 1945, as appears to have been the date of this instrument," the court being then and there informed that he would answer as follows: "Her mental condition was the same about which he has testified as being mentally incapacitated, as having brain storms and not being rational when it came to the matter of the question of the real estate and the title to this property." The court refused to reopen the case, and objection is made in an amendment to the motion for new trial, it being contended that the testimony would have contradicted the testimony of the witnesses for the propounder as to the testamentary capacity of the wife, and for various reasons urged and set out in the foregoing statement of facts it is argued that the direction of the verdict was error. No reason is assigned why the caveator could not have been asked the question while on the stand and before both sides had closed, and in such circumstances it rests in the sound discretion of the judge to determine whether he will permit the case to be reopened for the introduction of further evidence. Bridger v. Exchange Bank, 126 Ga. 821 (1) (56 S.E. 97, 8 L.R.A. (N.S.) 463, 115 Am. St. R. 118); Stewart v.Mundy, 131 Ga. 586 (3) (62 S.E. 986). No abuse of discretion is shown, and the court did not err for any reason assigned.
Judgment affirmed. All the Justices concur.