## 22165. CREWS v. CREWS.

ARGUED SEPTEMBER 10, 1963—DECIDED NOVEMBER 13, 1963.

*Lamar Gibson, Carroll Russell,* for plaintiff in error.

*Wm. A. McQueen, Leon A. Wilson,* contra.

ALMAND, Justice. Oliver Donald Crews, plaintiff in error, filed his application to probate in solemn form the will of Marziler Crews, under which he was nominated executor and sole

devisee of the entire estate. Three brothers and a sister of the testatrix, Lee A. Crews, Bobbie R. Crews, Lewis Crews and Mollie Crews Johns, defendants in error, filed their caveat to the probate alleging undue influence exerted by the propounder upon the testatrix "at a time when the enfeebled and impaired mind and body of the testatrix was unable and had not the capacity to resist said undue influence." After full hearing, the Judge of the Court of Ordinary of Charlton County entered judgment refusing probate of the will. The propounder appealed to the Superior Court of Charlton County and, pending trial of the appeal, filed demurrers to the caveat, which were overruled on each and every ground. Upon trial, after the introduction of evidence by both parties, the jury rendered a verdict against the will, and judgment was entered accordingly. Upon the overruling of his motions for new trial and judgment notwithstanding the verdict, the propounder sued out this writ of error, assigning error on such rulings and on the trial court's overruling of the propounder's demurrers to the caveat.

Marziler Crews, the testatrix, was one of nine children of Robert L. Crews, who conveyed the old home place to Marziler in 1942 but continued to live there until his death in 1945. Marziler remained a spinster and lived on this property until her death on February 17, 1961, at age sixty-nine. Her nephew Oliver, the propounder of the will, was the illegitimate son of Millie Crews Thomas, a sister of the testatrix who left the farm when Oliver was five years old. Oliver lived with Marziler until he entered military service in 1952. While Oliver was in service he married, and his wife Lucille lived with Marziler before his discharge. After Oliver's return to civilian life, he and Lucille lived on the farm with Marziler until her death, except for brief intervals during which their furniture remained in Marziler's house.

The alleged will was executed on May 9, 1960, in the office of Carroll Russell, the attorney who drew it, and was attested by Russell and two laymen, Doyle Lewis and Richard P. Mays, who were called to the office after the will had been prepared. At trial the testimony of all three attesting witnesses established that the will was signed in their presence by the testatrix

and that they signed it as witnesses in her presence and in the presence of each other. As to acknowledgment, all three testified that Russell asked the testatrix whether the instrument was her will and whether she wanted them to witness it, and that she answered in the affirmative but whether verbally or by a nod of the head they could not recall.

Neither Lewis nor Mays was personally acquainted with the testatrix and neither had a sufficient opportunity to form an affirmative opinion as to her mental capacity on this occasion, but both testified that they saw nothing to indicate that she was not of sound mind or that she was not acting of her own volition in executing the will. Neither Mays nor Lewis heard the will read or knew its contents, noticed whether the testatrix was wearing a hearing aid, or remembered whether the testatrix spoke in their presence.

The third attesting witness, Russell, testified that prior to the date of execution, Oliver Crews had come to see him about preparing an agreement between himself and his aunt involving the sale of land. About a week or two later, Oliver returned to the attorney's office accompanied by his wife, Lucille, and the testatrix. According to Russell's testimony, the testatrix discussed the terms of the sale agreement and directed him to prepare a written contract. The testatrix also told him that she desired to make a will and instructed him as to the type it should be. After a discussion of the will's terms and its preparation, the will was read to the testatrix and received her approval. Then Mays and Lewis were called in. Like the other witnesses, Russell was not able to remember the exact conversation which transpired at the execution of the will, almost three years prior to the trial, but his testimony was positive that the testatrix acknowledged the will and made known her desire that the witnesses attest it.

Russell also testified that during the period of from one to two hours that the testatrix was in his office he observed her in the discussion of the contract, during which she specifically raised the question of income tax considerations relative thereto, and in the discussion of the will. From this observation he positively concluded that, despite a hearing impediment which ne-

cessitated speaking to her in a loud voice, the testatrix was fully aware of what was being discussed and of what she signed, that her mental capacity was normal, and that throughout her stay in his office he observed nothing to indicate coercion against her by either Oliver or his wife during that time or in the past.

Both Oliver and Lucille positively testified that they had never put any pressure on the testatrix to make a will or to make a will in any particular way and that at the time the will was executed she was of sound mind.

Dr. Davis Bennett, Jr., who was qualified as a general practitioner and whose deposition was introduced in evidence by the propounder, testified that he had treated the testatrix for approximately four years prior to her death. She was usually brought to his office about once a month by either Oliver or Lucille Crews. His examinations of her nearest in time to the will's execution on May 9, 1960, occurred on March 21, April 19, June 7, and June 27, 1960. Dr. Bennett testified that the testatrix had suffered from hypertension, arteriosclerotic heart disease, and had been "a little hard of hearing," but that in his opinion her illness had not affected her mind in any manner whatever; that her mind was not enfeebled or impaired in any way; that she was capable of making decisions for herself; that her illness had not made her particularly susceptible to the persuasions, coercion, or influence of others; and that she was capable of making a will. He also testified that the testatrix was, in his opinion, cared for excellently and conscientiously and this was one of the reasons she lived as long as she did; that she never showed any symptoms of malnutrition, lack of proper diet, overwork or exhaustion; that she was always in reasonably normal spirits and never showed any sign of fear; that there was no indication that her medicines were not being properly taken.

Witnesses for the caveators testified that on a number of different occasions the testatrix had stated that she had not paid the consideration of $300 recited in the deed whereby her father had conveyed the home place to her and that the home place was hers as long as she lived but that at her death it would pass to her father's heirs.

Though the caveat did not allege that the testatrix lacked

testamentary capacity, the caveators introduced considerable evidence regarding her mental condition. However, the testimony of the caveator's witnesses on this point is vague, indefinite, equivocal and often contradictory. None of it relates directly to May 9, 1960, the date of the will's execution, and none of the recited incidents or events which were apparently intended to prove mental incapacity were shown to have occurred on or near that date.

The caveators introduced evidence of mistreatment of the testatrix by the propounder and his wife which was almost exclusively a repetition of various statements attributed to the testatrix. They also introduced the testimony of four witnesses that the testatrix had denied the making of a will after the execution of the instrument sought to be propounded.

In view of the disposition to be made of the case it will not be necessary for the court to rule on the propounder's assignment of error on the trial court's overruling of his demurrers to the caveat.

■ We will now consider the error assigned on the trial court's overruling of the propounder's motion for judgment notwithstanding the verdict. A decision favorable to the propounder on this point will dispose of the case.

Where there is any evidence upon which the verdict can be based, the jury is free to disbelieve whatever facts are inconsistent with their conclusion and the court cannot substitute its conclusion for that of the jury and enter a judgment notwithstanding the verdict. On such a motion the evidence must be accepted which is most favorable to the party in whose favor the verdict was rendered. *Echols v. Thompson,* 211 Ga. 299, 303 (85 SE2d 423). However, where the evidence demands a verdict for a party who, after denial of his motion for a directed verdict, moves for a judgment notwithstanding the verdict, it is reversible error for the court to refuse to grant such a motion. *Dykes v. Dykes,* 214 Ga. 288 (1) (104 SE2d 430). The question presented by the motion is whether there was any evidence to sustain the verdict against the movant.

The only ground upon which the caveat is based is that of undue influence. *Code* § 113-208 states that undue influence

which destroys a testator's freedom of volition so as to invalidate a will is that "whereby the will of another is substituted for the wishes of the testator." Following the celebrated opinion of Judge Lumpkin in *Potts v. House,* 6 Ga. 324 (50 AD 329), the court in *Galloway v. Hogg,* 167 Ga. 502, 524 (146 SE 156), considered undue influence and concluded: "Undue influence, to invalidate a will, must amount to force or fear—must, in effect, make the will the mental offspring of some other person, and must be operative on the mind of the testator at the time the will is executed. It must destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse." As to the amount of influence necessary, it has been held that undue influence necessary to dominate a mind impaired by age, disease or dissipation is less than that required to control a strong mind. *Dean v. Littleton,* 161 Ga. 651 (4) (131 SE 507). The courts have long recognized that undue influence in procuring a will may exist in many forms and may be active in many ways. The existence and effective power of undue influence is not always susceptible of direct proof. It may be proved by circumstantial evidence. *Brumbelow v. Hopkins,* 197 Ga. 247, 252 (29 SE2d 42). Nevertheless, it is insufficient to show merely that the persons receiving substantial benefits under the instrument sought to be propounded occupied a confidential relationship to the testator and had an opportunity to exert undue influence. *Norman v. Hubbard,* 203 Ga. 530 (2) (47 SE2d 574). The indulgence of mere suspicion of undue influence cannot be allowed. *Hill v. Deal,* 185 Ga. 42, 45 (193 SE 858); *Whitfield v. Pitts,* 205 Ga. 259, 273 (53 SE2d 549). Even the evidence of undue influence over the mind and will of the testator at another time will not invalidate a will. Only such influence which exists *at the time of the purported will's execution* destroys the testator's freedom of volition so as to invalidate a will. *Northwestern University v. Crisp,* 211 Ga. 636, 648 (88 SE2d 26).

After having reviewed the evidence in the light most favorable to the caveators and having applied thereto the foregoing principles of law, we are convinced that there is no evidence to support a finding of undue influence in this case. The factum

of the will, the apparent testamentary capacity of the testatrix, and the voluntary execution of the will by her were testified to by all three attesting witnesses. This having been done, the burden of proof shifted to the caveators. *Butler v. Lashley,* 197 Ga. 461, 467 (29 SE2d 508). The caveators failed to carry that burden.

There is no evidence whatsoever of any act of the propounder or his wife at the time of the will's execution or of any prior act whose effect remained active on the mind of the testatrix which would constitute undue influence. The most that can be said for the caveators is that the circumstances show the possibility of an opportunity to exercise such an influence. But this fact alone or mere suspicion of undue influence is not sufficient to make an issue. *Brumbelow v. Hopkins,* 197 Ga. 297, supra; *Whitfield v. Pitts,* 205 Ga. 259, supra. The evidence here falls short of showing that any undue influence was actually exerted at any time and is particularly silent as to the time when the will was executed.

■ Counsel for the caveators maintain in their brief that a consideration of the case is not limited to the issue of whether the evidence supported a finding of undue influence. Without citing authority, they state that since evidence on the issue of lack of testamentary capacity was introduced without objection this issue was made by the evidence, though not included by the caveat, and could have been considered by the jury in reaching its verdict.

The time to apply the test of testamentary capacity is the time of the execution of the will. "Where testamentary capacity is the issue, the controlling question to be determined is the condition of the mind at the time of the execution of the will. As tending to illustrate the mental condition at that time, evidence of such condition at other times may be received; but where it is sought to establish testamentary incapacity by such evidence, it does not controvert the positive testimony of the subscribing witnesses unless it would be proof of testamentary incapacity at the time the will was signed." *Fehn v. Shaw,* 199 Ga. 747, 754 (35 SE2d 253). Testimony as to the testatrix's mental capacity at other times cannot break down the positive testimony of the

■

subscribing witnesses establishing testamentary capacity. *Whitfield v. Pitts*, 205 Ga. 259, 272, supra.

The caveators assumed the burden of proving lack of testamentary capacity. The positive testimony of the subscribing witness Russell and of the others who gave their opinion as to the mental condition of the testatrix at the time the will was executed, that she did have the necessary testamentary capacity, was not overcome by the nonexpert witnesses, whose opinions were based upon facts from which the legal conclusion that the testatrix did not have the required testamentary capacity could not be drawn, testifying on behalf of the caveators. Such evidence was insufficient to overcome the positive testimony of those who observed her at the moment the will was executed. *Brumbelow v. Hopkins*, 197 Ga. 297, supra; *Fehn v. Shaw*, 199 Ga. 747, supra.

After a careful consideration of all the evidence, construed in the light most favorable to the caveators, we are forced to the conclusion that aside from mere suspicion as to undue influence and lack of testamentary capacity there is in fact no direct or circumstantial evidence to support the verdict. The propounder's evidence made a prima facie case that the testatrix was of sound mind at the time of the execution of the will and that the will was duly executed and entitled to probate. There is a total absence of evidence on behalf of the caveators on the issues of undue influence and mental incapacity of the testatrix at the crucial time of execution. As a result of this total absence of evidence there was no question to be submitted to the jury. There being no doubt in the contemplation of the law, there was nothing to be determined by "the doctors of doubt, the jury."

It was error to overrule the motion for judgment notwithstanding the verdict. Direction is hereby given that judgment be entered in accordance with the motion.

*Judgment reversed with direction. All the Justices concur.*