1. Counsel for the plaintiffs in error, in their oral argument before this court on the call of the case, having conceded that the attack made upon the will for lack of testamentary capacity was not supported by the evidence, that question will not be considered.
2. Under the evidence, the verdict of the jury, finding against the caveators' contention that the testator executed the will in question under fraud, duress, and undue influence, was demanded.
3. Under the foregoing ruling, a consideration of the special assignments of error becomes unnecessary.
 No. 14767. FEBRUARY 9, 1944. REHEARING DENIED MARCH 9, 1944.
This case arose on a caveat to the probate of a will on the grounds of (1) lack of testamentary capacity, and (2) fraud, duress, and undue influence. The verdict was in favor of the propounder. The exception is to the overruling of the motion for new trial. The testator, Sidney Porter, died on August 3, 1941. His will, disposing of an estate of the approximate value of $70,000, was executed on May 10, 1937. A two-story building, which was valued at from $10,000 to $12,000, and which produced in 1942 a net income of $481.92, was devised to Annie Pearl Porter for life, "with remainder to her children; but if she should die without leaving issue, then said property shall go to Pearl Lashley, Jack Lashley, and Twilight Reed, share and share alike, with remainder to their children, but if any of said three die without leaving issue, then their share to go to the survivor or survivors." Annie Pearl Porter was also given a piano. The personal property of every kind and description, with the exception of the piano, was given to Pearl Lashley. The sum of $40 per month was bequeathed to Bertha Porter Butler, a daughter, for and during her natural life, to be paid from the income of the estate other than from the brick building devised to Annie Pearl Porter. The residue of the testator's real estate was devised to Pearl Lashley, Annie Pearl Porter, Jack Lashley, and Twilight Reed for and during their natural *Page 462 
lives, with remainder to their children, but if any one of these four died without leaving issue, his or her share was to go to the survivor or survivors, share and share alike. The testator directed that this real estate, together with the brick building given to Annie Pearl Porter, be held and managed by Pearl Lashley, the executrix named; that it be not sold during the lives of said four persons; and that, after the payment of expenses and the $40 per month to Bertha Porter Butler as above directed, the income be divided among the said four persons.
On the trial the evidence disclosed that the testator had been twice married, and that both of his wives had died before his death and before the execution of his will. He was survived by only two heirs, Bertha Porter Butler, a daughter by his first wife, and Twilight Reed, a daughter by his second wife. Pearl Lashley, who was no blood kin of the testator, had come to Columbus, Georgia, where the testator lived, in 1927. About two years later he made her his housekeeper, gave her a home, and moved into it with her. From that time until the death of Porter, Pearl Lashley remained his housekeeper, looked after his home, cooked his meals, and worked in the store operated by him. Jack Lashley, the son of a cousin of Pearl Lashley, was three years of age at the time Pearl moved into the home furnished her by the testator. He is now nineteen years of age and is in the Army. Annie Pearl Porter, who is now eight years of age, is the illegitimate child of a friend of Pearl Lashley. The child was born in the home of Pearl Lashley, and has since lived there with the testator and Pearl, who have always provided and cared for her.
Twilight Reed, one of the caveators, testified in part as follows: "I am twenty-five years old now. Sidney Porter was my father and I was born in Columbus, Georgia, at 817 Sixth Avenue; that was the old home-house and I was raised there. I went to the public schools until I got to the second grade, and I went to the public school in Birmingham up until I got to the sixth grade, and then I came back here and continued through the public school here in Columbus. . . My mother died in 1926, and I was eight years old then. Pearl Lashley was there at the store when I came from Huntsville in 1928, where I had been with Bertha, my sister; I was about ten years old when I came from Huntsville in 1928. . . I was fifteen years old when I got married, and I *Page 463 
was living at Sidney's house then. My relationship between me and my father changed after Pearl came to live there. Before I saw Pearl there, he would always hug and kiss me and give everything that a child could want and need and everything; sent me to school and he just did everything that a father would do for his baby child. When I came back from Huntsville and found Pearl there, I was treated cruelly. I lived with her, and she whipped me and scolded me and run me away from the house and told my daddy I didn't care anything about him, and that I wasn't going to stay there; she told him that many times, she said it all the time, practically every day, that I didn't care anything about him, and at night I can hear her all during the night in there talking and telling him things. When I came back from Huntsville, she was there. She was living on Sixth Avenue, and my father was living down there with her then. I lived there in that house with them two or three weeks, and he said he didn't want me to live there, and he got me a place to stay with Mr. McBride. When I got down to that house, I found Pearl and my father occupying the same bed, not occupying different rooms. There wasn't but one bed in the room, and he slept with her, and Jack and myself slept in the back room. . . and daddy and her slept together. . . Where she is living now, she had a lot of jars and things on the mantel-piece and a lot of them in the wash-stand. Her sister come . . to visit her, and after Pearl had found out that her sister had been talking to me she came to me and said — brought daddy down to the house and said: `Mr. Porter, Twilight said my sister said that these roots and things on the mantel-piece contained things to keep you, and help me to get all of your property, and things like that;' and she said that an old man gave her this bottle with these — containing these roots and things in it, and this old man said they would bring her good luck, and when she came to Columbus she would meet a rich man and he could never get rid of her. Pearl had about twenty-five or more of these jars around there. My father told her to take them out of the house; I heard him do that. Pearl told him that was her house and she would put him out. . . I didn't go to the reform school. They put me in the juvenile court and I was boarded out after Pearl came there. When my daddy was going to send me to Tuskegee to go to school, I came up there that Sunday to *Page 464 
bid him farewell and I was going up town to visit some friends of mine — classmates and bid them farewell, and when I went up town, Pearl told daddy I had run away. When I came back that night he was under that impression, and the next morning he said I had run away and Pearl said that I couldn't go off to boarding-school and he wasn't going to do anything against her will because he was afraid to do so. Then she had the juvenile court to come and get me. She would beat on me constantly, and strike me, and whip me all the time; and mostly when she whipped me and beat on me and everything, I would leave there. I heard her tell my father he didn't need me around there. Jack could do anything around there at the same time; and he didn't have any use for me around there, and she was going to let me stay if he didn't want me there, and that is why he kept me boarded out all the time, because she wouldn't let me stay there with her along at the time. She told my father that this boy Jack could do all the work necessary around there. I saw Pearl sell these sacks of dirt — she sold about a hundred or hundred and fifty sacks a day. She sold some fifteen or twenty dollars a week. Several people would come up there and carry her back in the back of the store, and I could hear them talking, and they said they wanted to get rid of something, and would it do good if they buy it, and to make a trade she would always tell them `yes.' . . Lawyer Palmer was the only one that I knew was my father's lawyer. I did go to Judge Palmer's office with my father. I never heard of Mr. Slayton being his lawyer or any one else being his lawyer. My father would always tell me he had given Pearl the house that she was living in; it was a number of times he mentioned it. My father said that he had deeded her that house, and that he was going to give her twenty dollars a month, and that would keep her from interfering with what he was going to give us, and this statement was made about a week before his death. . . It was during that last visit that he made this statement to me, that he had given her the house and twenty dollars a month and that was all she was going to get. After my husband and I separated, my father told me he was going to put up a cafe down there for me to run, and that would be the way that I would make my living. Well, Pearl comes around and said that if I didn't do exactly what she wanted to do in there that she wasn't going to let me stay there, and she came down there *Page 465 
and ruled the place, and run the customers out, and take all of the money out of the cash register, and just use me for an outsider, and I didn't have any authority, none whatsoever, and when I wouldn't do exactly what she said, if I quarreled with her about running the customers away all the time, she would get a stick and beat me across the head, and run all of the customers out, and by me being so childish-like I just went on away to keep from having any more confusion with her, and let her have the restaurant. My father opened it up for my benefit, but I didn't get any benefit out of it. Every night at the closing time, she would come down and take the money out of the cash register, and didn't leave me any authority whatsoever, and anybody come around there she would say it was her cash register, and if I didn't do as she said I could get out of there, that Mr. Porter opened it up for her. I was there when Annie Pearl came there, she was two months old. She was not born in my father's house, she was born in Eufaula, Alabama. . . When Pearl would beat me and run me off, daddy would usually beat Jack and run him off, but Pearl would always go back and get Jack, and would tell daddy, `if you didn't let him stay — if you don't let him stay up to this store, I will kill you and him, and you had better let him alone;' and she said: "Twilight don't love you or anything,' and she just — she just made false pretendance against me; and every time daddy would run Jack away she would always go back and get him. . . I was under the control of the juvenile court not quite a year, and boarded with Mrs. McNeal. The only thing I could see why I was put in the juvenile court was that Pearl had told daddy I had runned away, and she went and called the juvenile court and they came and got me; that was the only reason why I know of. . . Pearl told my daddy that I had some kind of a disease or something when I was staying there, and I don't know anything about it; she said it was syphilis, or something. That was untrue because I went to the hospital dozens of times, and had them to take blood tests and things, and it would always come back O. K. I was taking those tests because I wanted to prove to see really did I have what she said I had. When she told my father that, I went to have a blood test made. The tests were negative. What she told my father was untrue."
The evidence of Bertha Porter Butler, the other caveator, showed *Page 466 
that she was forty-three years of age; that she lived with her father until she was eighteen years of age, at which time she married; that she spent five years in Spellman College and her father paid the bills. She and her husband returned to Columbus in 1930 or 1931 and found Pearl in her father's home. Her father was good to her until Pearl came into his home, and after that he was a different man, and refused to do anything for her. A few months later she and her father, her husband, and Pearl had a disagreement and a fight. As a result of this altercation her father and Pearl had an officer to tell her to leave town, or be placed in jail. She left town and remained away for about ten years; but wrote letters to her father at least once a month. She returned to see her father in 1940 when he was ill.
Sandy D. Allen, a former business associate of Sidney Porter, testified in part as follows: "The will that Mr. Palmer drew was mentioned in 1932. I went to the store one day and he [Sidney Porter] said, `I have made my will out, Mr. Palmer drew it for me, and he brought it down here to be signed.' He said, `and Pearl raised so much sand about it' that he said he didn't sign it, and that before he would sign the will any other way than the way he wanted it he would give his stuff to the city. . . It was in 1932 he told me about the will, the one Judge Palmer wrote."
The motion for new trial, as amended, contained the usual general grounds and seven special grounds. The special grounds were based on exceptions to the charge of the court, and the admission in evidence over objection of certain documentary evidence.
1. The first of the two grounds of attack upon the will was lack of testamentary capacity. Several witnesses, including four doctors, delivered testimony touching the mental capacity of Sidney Porter at the time of the execution of the will; and the evidence in this respect overwhelmingly showed him to be a man of strong mind and firm convictions. In fact counsel for the plaintiffs in error, in their oral argument before this court, conceded that there was no evidence to support this contention. *Page 467 
2. The remaining ground of attack now insisted upon was the alleged undue influence, coupled with coercion and fraud, practiced upon the testator by Pearl Lashley. "The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the testator." Code, § 113-208. And "a will procured by misrepresentation or fraud of any kind, to the injury of the heirs at law, is void." § 113-209. In the statement of facts we have quoted at length from the testimony of Twilight Reed, one of the caveators, and others, setting out in detail all the evidence favorable to the contentions of the caveators, for the reason that, if undue influence, duress, coercion, or fraud can be established by any fact or facts from the testimony, such fact or facts must be found in that evidence. No other witness testified to any fact or circumstance of probative value tending to support this contention. The issue being one of devisavit vel non, the burden in the first instance was upon the propounder of the alleged will to make out a prima facie case by showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and so acted freely and voluntarily. And when this is done, the burden of proof shifts to the caveators. Thompson v. Davitte,59 Ga. 472, 475; Credille v. Credille, 123 Ga. 673 (2) (51 S.E. 628, 107 Am. St. R. 157); Edenfield v. Boyd, 143 Ga. 95
(84 S.E. 436); Bullock v. Martin, 144 Ga. 731
(87 S.E. 1058); Smoot v. Alexander, 188 Ga. 203
(3 S.E.2d 593). This burden was fully carried by the testimony of two of the subscribing witnesses.
We next look to the evidence of the caveators, to discern what fact, if any, was shown in the case that could be considered as having influenced, coerced, or defrauded Sidney Porter into executing and publishing the will in question. The only evidence of any fact that could be classed as fraudulent or deceptive is the testimony of Twilight Reed that Pearl Lashley repeatedly stated to Sidney Porter that Twilight, his daughter, did not love him. The burden was on the caveators to prove that this statement was made for the purpose of influencing the testator to make the will, which he would not have made but for the deception wrought by the *Page 468 
statement; and to say that the statement did deceive the testator, they would necessarily have to establish the falsity of the charge. Twilight, the daughter about whom the statement was made, was the only witness who testified concerning this statement made by Pearl Lashley, and she did not deny the truth of the statement, nor did she testify that, as a matter of fact, she did love her father. The evidence as a whole failed to show an attitude on the part of either of the daughters indicating any very deep affection for their father. The evidence wholly fails to show that this statement by Pearl had any influence whatever on the mind of Sidney Porter at the time he executed his will. Can it be said that this statement, which may or may not have been a truthful statement, made by a person who could know no more about the affection of the daughter for the father than the father himself knew, had the effect of controlling the mind of this man of strong intellect to the extent of substituting the will of Pearl Lashley for that of the testator? Especially is this true when the evidence is silent as to whether Pearl ever discussed with the testator how or to whom he should by will dispose of his property. It must be remembered that the statements were made several years, at least five or six, before the execution of the will; and nowhere in the evidence does it appear that the statement was made with the view or intent of influencing the testator, or coercing him in the making of his will. In fact, the evidence fails to disclose that the subject of making a will was ever discussed or referred to by Pearl Lashley in any conversation with the testator. "Undue influence or fraud, to invalidate the will, must amount to force or fear — must, in effect, make the will the mental offspring of some other person; and must be operative on the mind of the testator at the time the will is executed." Thompson v. Davitte, supra. "Undue influence which operates to invalidate a will is such influence as amounts either to deception or to force and coercion, destroying free agency." Bohler v. Hicks, 120 Ga. 800 (5) (48 S.E. 306). In the case of Morris v. Stokes, 21 Ga. 552,572, the court, in upon the character of influence which would invalidate a will, stated that "the only test is, is the testator's free agency destroyed?" In that case the trial judge charged the jury in words from 1 Williams on Executors, 39, as follows: "There must be proof that the act was obtained by force and coercion, by importunity *Page 469 
which could not be resisted, that it was done merely for the sake of peace, that the motive was tatamount to force and fear." The court approved the charge. In Slade v. Slade, 155 Ga. 851,863 (118 S.E. 645), it was said that "such fraud as will invalidate a will must be fraud which operates upon the testatrix — a procurement of the execution of the will by misrepresentations made to the testatrix. `Fraud sufficient to invalidate a will exists only when it is shown that the testator relied on the misrepresentation and was deceived.' 40 Cyc. 1143." The construction of the evidence most favorable to the caveators shows that it might be inferred that Pearl Lashley was a woman of dominant character. On one occasion she threatened the life of Porter if he did not let Jack Lashley stay at the store. On another occasion she threatened to put Porter out of the house because he objected to her having several bottles of herbs in the house. This was the house that Porter had given to Pearl, and in which they lived for about ten or eleven years before his death, and according to Twilight, they lived in a state of adultery and fornication. There was also evidence to the effect that in 1932 Porter had Judge Palmer prepare a will for him, but that he never signed it, stating that Pearl raised so much sand about it, and before he would sign it other than the way he wanted it, he would give his property to the city. The evidence of the caveators is wholly silent as to the circumstances surrounding the execution of the will. As was said in Hill v. Deal, 185 Ga. 42, 45
(193 S.E. 858):"One or all of the foregoing pieces of testimony might raise the suspicion that the paper offered for probate was not the will of . . [the testatrix], but that instead it was executed by her when old and feeble and on account of some undue influence exercised over her by the two daughters named; but there is no circumstance or a chain of circumstances that would justify a verdict based on the theory that any undue influence was exercised. A bare suspicion, even in a civil case, can not be the basis of a finding of fact. The most that could be claimed would be that there are circumstances in the record that show that the two sole beneficiaries had the opportunity to exercise or to attempt to exercise undue influence on their mother at about the time the instrument was signed. There was no evidence that they did exercise it, and nothing to justify the inference that they did. The fact that the two daughters were *Page 470 
with the testatrix during her latter days, more than the caveators were, affords no basis for a finding that they used undue influence." That very language is fittingly applicable to the facts in the present case. See Brumbelow v. Hopkins,197 Ga. 247 (29 S.E.2d 42). "Undue influence in procuring a will to be made must amount to moral coercion; it must destroy the free agency of the testator and constrain him to do what is against his will but which he is unable to refuse. Not all influence is undue." Griffin v. Barrett, 183 Ga. 152, 164
(187 S.E. 828), citing De Nieff v. Howell, 138 Ga. 248 (6) (75 S.E. 202); Burroughs v. Reed, 150 Ga. 724
(105 S.E. 290); Ricketson v. Ricketson, 151 Ga. 540 (107 S.E. 522);Ward v. Morris, 153 Ga. 421 (3) (112 S.E. 719), and others.
Again it must be kept in mind that the testator not only did not exclude his daughters as beneficiaries under his will, but on the contrary he made substantial bequests in their behalf. The other beneficiaries, Pearl Lashley, Jack Lashley, and Annie Pearl Porter, while of no blood relationship to him, were of a relationship from which one could well assume that he had considerable interest in their welfare and felt much responsibility to them. Pearl had been his housekeeper and helper in his business affairs for eleven or twelve years. Jack Lashley had been in his home since he was a small boy, and no doubt had rendered valuable services in and about the store; in fact Porter was the only father so to speak that Jack had known. The same may be said in reference to Annie Pearl Porter, a child who had been given to the testator and Pearl Lashley at the time of her birth. She had been given his name, apparently by usage, and according to the evidence, was his heart's delight. We refer to these last-mentioned beneficiaries merely for the purpose of showing the relation which they occupied to the testator.
Under the above views, we reach the conclusion that the finding of the jury upholding the validity of the will, under the evidence, was the only verdict which they could have legally rendered.
3. Under the foregoing ruling, a consideration of the special assignments of error becomes unnecessary.
The lower court did not err in overruling the motion for new trial.
Judgment affirmed. All the Justices concur. *Page 471