## 44569. ARNAU et al. v. COCHRAN.
(361 SE2d 173)

GREGORY, Justice.

Edgar Stanley Henry died October 26, 1982. Probate of his will was sought in the Probate Court of Cobb County. A caveat was filed by Elizabeth Arnau and others who are brothers and sisters of the deceased and his heirs at law. His wife predeceased him and he had no children. Grounds of the caveat were undue influence and lack of mental capacity to make a will. The probate court admitted the will to probate over the caveat.[1] The caveators appealed to the superior court where summary judgment[2] was granted to propounder. That judgment was appealed to this court. We affirm.

The record shows that testator served in the Army Air Corps in World War II where he received certain injuries for which he later obtained psychiatric treatment through the Veterans Administration. In February of 1965 and June of 1966 testator was evaluated by Dr. Lawrence T. Brannon, a psychiatrist. His diagnosis was that testator suffered from ". . . schizophrenic reaction, schizo-affective type, manifested by severe depression, agitation and thinking impairment." Dr. Brannon did not consider testator to be able at that time to manage his financial affairs and concluded that it was likely his condition was total and permanent. But, the doctor declined to predict what his future condition would be and he noted testator was lucid enough to furnish his occupational and medical history. It is the testimony of Dr. Brannon upon which caveators primarily rely in their challenge as to testator's mental capacity. Dr. Brannon did not treat testator nor did he have any further contact with him after June 1966.

The will was executed on February 6, 1978. In the interval since evaluation by Dr. Brannon testator was under the care of two other doctors. Dr. Talbert Williams, an internist, along with associates saw testator on occasions from December 1976 until February 6, 1978, the day preceding the execution of the will. Dr. Williams testified that testator's schizophrenia was in complete remission due to treatment, that he was functioning normally and able to attend to his affairs. Dr. Charles Preacher, a psychiatrist, saw testator at a Veterans Administration out-patient clinic from 1970 until he died in 1982 at intervals from two to six months apart. He considered testator to be lucid with logical and coherent thought processes and with no mental deficiency.

---

[1] The will disposed of the bulk of the property of testator by passing it to an attorney and his secretary. The attorney was not the scrivener of the will. Instead, he was a friend of testator who met him through a Masonic lodge. Over a number of years the attorney and his secretary befriended testator.

[2] Propounder filed a motion for partial summary judgment relating to other matters (whether the money in various bank accounts passes under the will) which was denied and from which there was no appeal.

While he suffered from anxiety there were no symptoms of a schizophrenic condition.

The medical testimony of Dr. Brannon based upon testator's condition a dozen or more years before the execution of the will is completely overcome by testimony of Drs. Williams and Preacher. They explained that testator's condition was in remission due to treatment. Thus there is no medical evidence testator was rendered incompetent to make a will in 1978 by a condition which existed in 1965 and 1966.

A number of lay witnesses were deposed but a careful examination of their testimony fails to reveal any evidence of lack of mental capacity to make a will on February 7, 1978. Their testimony indicated testator had quirks, rambled a lot and repeated himself in conversations, did not get along with others well, wanted sympathy, sometimes got befuddled, did not seem to think straight about some things, drank alcohol, and pulled a knife on another. They also drew conclusions that he "didn't have enough sense to make a will" and was "never competent to do anything." But the facts given to support these conclusions fail to support them. Nor do the facts relate to the critical time of February 7, 1978.

Propounder offered the testimony of the scrivener and witness to the will. Their testimony if unrefuted would establish that testator possessed the required mental capacity to make a will.

1. One possesses the mental capacity to make a will if (1) he understands that a will has the effect of disposing of his property at the time of his death, (2) is capable of remembering generally what property is subject to his disposition by will, (3) and those persons related to him, and (4) is capable of expressing any intelligible scheme of disposition. *Spivey v. Spivey*, 202 Ga. 644, 651 (44 SE2d 224) (1947). The medical testimony in this case is unequivocal that testator possessed the requisite mental capacity on the date of the execution of the will. The existence of a condition which might have interfered with the ability to make a will some 12 years before simply did not exist at the time in question. Nothing said by the lay witnesses is evidence of a lack of sufficient mental capacity on the date the will was executed.

The burden carried, the trial court properly granted summary judgment as to mental capacity.

2. The caveators alleged the will was the result of undue influence. Propounder offered testimony of witnesses present at the execution of the will and other witnesses familiar with circumstances leading up to its execution. This testimony demonstrated an absence of undue influence. The evidence offered by caveators showed at most a motive and opportunity for beneficiaries under the will to have engaged in fraud and undue influence. This is insufficient to create an issue of fact. *Dobbs v. Burnette*, 250 Ga. 47, 49 (295 SE2d 836) (1982).

Summary judgment for propounder on the issue of undue influence was proper.

*Judgment affirmed. All the Justices concur, except Bell, J., who dissents. Clarke, P. J., disqualified.*

DECIDED OCTOBER 21, 1987 —
RECONSIDERATION DENIED NOVEMBER 4, 1987.

*Virgil C. Spence,* for appellants.
*Dupree & Staples, Hylton B. Dupree, Jr., A. Greg Poole, Mark A. Johnson,* for appellee.

## 44800. DAWSON v. WADE.
(361 SE2d 181)

WELTNER, Justice.

Wade and Dawson own parcels of real property that are divided by Reedy Creek, Wade's property being to the west and Dawson's to the east of the creek. The creek is fed principally by artesian springs located on Wade's property. There are four beaver dams along the segment of the creek that divides the two properties. The dams, in everchanging form, have been in the creek for some twenty years, and have the effect of causing swampy conditions on either side of the creek. It is Dawson's desire to destroy the dams. Wade, *contra,* finds them useful for irrigation. Both parties use water from the creek to irrigate crops.

Dawson dug a canal on his property six feet deep and twenty-five feet wide, and roughly parallel to the creek. During the digging of the canal, the eastern bank of the creek was breached, with the result that the waters of the creek were diverted into the cana., drying up a segment of the creek. At the same time, the beaver dams were damaged. Wade sought injunctive relief. After hearing, Dawson temporarily was "restrained and enjoined from continuing to dig the channel or in anywise further diverting the waters of" the creek, and was "enjoined from changing the status quo of the diversion of the waters of" the creek and "from further obstructing and diverting the said water course."

Following a trial, Dawson further was enjoined from digging of the canal, and he was ordered to "fill up his canal entirely and without reservation." The final judgment and decree also provided that prior to filling the canal Dawson "shall make a seal of wood, concrete, or other material, at the point where the canal penetrates the east edge of Reedy Creek so that the canal is sealed off and waters of Reedy Creek do not enter the canal." While the trial court did not

order specifically either party to take (or to refrain from taking) any act concerning the beaver dams, it entered the following conclusions of law:

(a) "Beaver dams Nos. 1, 2, 3 and 4 have been in existence for more than twenty (20) years and therefore incorporeal rights have been acquired. Both parties have lost their right to the natural flow of Reedy Creek uninterrupted by the beaver dams because of their existence for so long a time. The temporary breaks in these dams by Dawson were so promptly repaired they did not break the continuity of their existence so to prevent prescriptive rights."

(b) "Wade has an easement to flood the lands of Dawson caused by the backing of the waters of Reedy Creek by beaver dams 1, 2, 3, and 4 and Dawson likewise has an easement to flood the lands of Wade caused by the backing up of waters from dams Nos. 1, 2, 3 and 4."

(c) "Thus, the parties no longer have the right to pass the waters of Reedy Creek unobstructed by these beaver dams. Both have the right to maintain the accumulated water behind these dams on each other's lands, because they are no longer under a duty to return the natural flow of the stream unimpeded by these dams. To hold otherwise, would allow Wade or Dawson to drain the back waters from these dams, which, at least Wade, has used and relied upon."

1. OCGA § 44-8-2 provides: "The beds of nonnavigable streams belong to the owner of the adjacent land. If the stream is a dividing line between two parcels of land, each owner's boundary shall extend to the thread or the center of the main current of the water. If the current changes gradually, the boundary line follows the current. If from any cause the stream takes a new channel, the original line, if identifiable, remains the boundary. Gradual accretions of land on either side accrue to the owner of that side."

2. OCGA § 51-9-7 provides: "The owner of land through which nonnavigable watercourses flow is entitled to have the water in such streams come to his land in its natural and usual flow, subject only to such detention or diminution as may be caused by a reasonable use of it by other riparian proprietors. The diverting of the stream in whole or in part from its natural and usual flow, or the obstructing thereof so as to impede its course or cause it to overflow or injure the land through which it or any right appurtenant thereof, or the polluting thereof so as to lessen its value to the owner of such land shall constitute a trespass upon the property." While the code section clearly applies to upper and lower riparian owners, we view its provisions to extend also to owners of parcels on either side of the stream.

3. (a) We must disagree with the trial court concerning the status of the beaver dams in the applicable segment of Reedy Creek. The dams are not the handiwork of Wade, and he can enjoy no prescrip-

tive right to their continued existence. OCGA § 44-5-161 and 175. The case of *Brown v. Tomlinson*, 246 Ga. 513 (272 SE2d 258) (1980), is inapplicable to the circumstances of this case. There, the dam was erected through human agency and with common consent of riparian owners, including the complainant's predecessor in title.

(b) In so holding, it must be made plain that Dawson will not be permitted to trespass upon Wade's property in order to remove the dams, should he choose so to do.

4. Having thus disposed of the question of the beaver dams, we now consider whether requiring Dawson to fill completely the canal (the same being entirely on Dawson's property), is necessary in order to restore and maintain the flow of the creek as it existed before it was diverted by Dawson. After conducting a personal inspection of the lands of both parties, the creek, and the canal, the trial court concluded that such relief was necessary in order to afford to Wade complete relief. Even so, it is unclear to us whether so far-reaching direction was founded upon the ruling that the beaver dams must remain undisturbed. In view of our contrary holding, this case is remanded with the request that the trial court re-examine this aspect of its order (i.e., the complete filling up of the canal) to determine whether that is necessary to restore and maintain the creek banks breached by Dawson. "[T]he injunction should always be so worded as not to impose on defendant any greater restriction [burden] than is necessary to protect plaintiff from the injury of which he complains." H. McClintock, *Principles of Equity*, p. 392 (2d ed. 1948).

5. We find no error in the remaining enumerations.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Gregory and Bell, JJ., who dissent.*