S95A1537, S95A1538. EDWARDS et al. v. SHUMATE et al.
(two cases).
(468 SE2d 23)

SEARS, Justice.

These appeals concern the estate of James Cornwell, who died on December 28, 1992. Mr. Cornwell's will left his property to the appellees, Charles and Joyce Shumate, who befriended James in the 1980s. The appellants are James's nieces and nephews and are his sole surviving relatives. They brought this action to set aside James's will on numerous grounds. The trial court granted the Shumates' motion for summary judgment as to the appellants' claims of lack of testamentary capacity and fraud, as well as on their claim that the Shumates procured James's death and are thereby barred from taking under his will pursuant to OCGA § 53-4-6. The trial court, however, denied the Shumates' motion on the appellants' claim of undue influence. The appellants appeal from the trial court's grant of summary judgment, but for the reasons that follow, we affirm.

For a number of years before 1976, James Cornwell and his siblings, Burton Lane Cornwell and Josephine Cornwell Orr, had lived together. In 1976, the Cornwell siblings executed wills containing the same disposition of assets. The wills left the siblings' respective estates to surviving siblings, if any, and then to their heirs at law. All three siblings were without issue, and the appellants were the ultimate beneficiaries of these wills. Charles and Joyce Shumate developed a relationship with the Cornwell siblings in the early 1980s when Charles was appointed a deacon in the siblings' church and began making visits to the siblings. In July 1988 Josephine Orr and James Cornwell executed powers of attorney in favor of Charles Shumate, and one week later, executed codicils to their wills removing Trust Company Bank as executor and appointing Charles as executor and Joyce as alternate executrix. An attorney, Michael Greene, prepared these documents. In August 1988 Burton Cornwell died. In August 1989, Josephine Orr and James Cornwell executed second codicils to their wills. Under these codicils, the estates would go first to the surviving sibling, but then would go to the Shumates, instead of to the appellants, as ultimate beneficiaries. The codicils also provided that Michael Greene, and not the Shumates, would act as executor. Again, Michael Greene prepared these codicils. On February 15, 1990, Josephine Orr died, and Greene, as executor, probated her will and its codicils. On December 19, 1992, James suffered a stroke while alone in his home. On December 19, he was admitted to Humana Hospital where he died on December 28.

In January 1993, Michael Greene, as executor, petitioned the probate court to admit to probate James's 1976 will and its codicils. The appellants filed a caveat, however, contending that the codicils to the

will are invalid as a result of a lack of testamentary capacity, fraud, and undue influence. The appellants also contended that the Shumates could not inherit under OCGA § 53-4-6 because the Shumates had procured James's death. The probate court issued an order authorizing appellants to pursue claims on behalf of the estate in superior court. The appellants then filed a complaint in superior court for, among other things, wrongful death, constructive and actual fraud, wrongful conversion, tortious interference with an expectancy under a will, and waste and mismanagement. In February 1995, the superior court entered a consent order consolidating the probate court action with the superior court action.

The trial court entered an order granting partial summary judgment to the Shumates on the appellants' claims that James Cornwell lacked testamentary capacity when he executed the first and second codicils to his will; that the Shumates procured the codicils by fraud and misrepresentation; and that the Shumates were statutorily barred from inheriting since they had procured James Cornwell's death. The trial court denied the Shumates' motion for summary judgment on the issue whether the first and second codicils were procured by undue influence. The appellants filed a notice of appeal in superior court, and that appeal is Case No. S95A1537. As part of the record remained in probate court, the appellants filed a notice of appeal in that court directing it to send the record to superior court. The probate court record, however, was docketed here as Case No. S95A1538. As both appeals stem from the same superior court order, this Court has consolidated the appeals.

1. The appellants first contend that there was sufficient evidence to create a jury issue concerning James Cornwell's testamentary capacity at the time he executed the first and second codicils to his will, and that the trial court erred in granting summary judgment to the appellees on this issue. Having examined the evidence, however, we conclude that the trial court properly granted summary judgment to the appellees on this issue. See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

2. The appellants next contend that there was sufficient evidence to create a jury issue on their contention that the first and second codicils were procured by fraud and misrepresentation. We conclude that the trial court properly granted summary judgment on this issue.

"Fraud is a distinct head of objection to the validity of a will, from importunity and undue influence; usually they are the very opposites of each other. Both are equally destructive of the validity of a will."[1] The type of fraud that "will invalidate a will must be fraud

---

[1] *Stephens v. Brady*, 209 Ga. 428, 433 (2) (73 SE2d 182) (1952) (quoting *Terry v. Buff-*

which operates upon the testator, i.e., a procurement of the execution of the will by misrepresentations made to him. It exists only when it is shown that the testator relied on such a representation and was deceived."[2]

With regard to their fraud claim, the only specific statements by the Shumates which the appellants claim were fraudulent were negative statements that the Shumates made about a neighbor who had had power of attorney for the Cornwell siblings, and statements to the effect that the Shumates had told James Cornwell that neighbors may try to poison him. While such evidence may be relevant to the appellants' claim of undue influence,[3] these allegedly fraudulent statements are unrelated to James's execution of the codicils and simply do not support a claim the Shumates procured the will based upon misrepresentations.[4] Further, without pointing to any specific evidence of fraud, the appellants contend that the only reasonable inference to be drawn from the execution of the codicils is that their execution was the result of misrepresentations by the Shumates. We have held, however, that evidence of the mere opportunity and motive for fraud is insufficient to create an issue of fact on such a claim.[5] We find no other evidence in the record that would create an issue of fact as to fraud, and hold that the trial court properly granted summary judgment on this issue.

3. The appellants next contend that the trial court erred in granting summary judgment to the appellees on the issue whether the appellees wrongfully procured the death of James Cornwell. We conclude, however, that the trial court did not err.

The appellants rely on OCGA § 53-4-6, which provides as follows:

> (a) The right of inheritance shall be denied any person who with malice aforethought kills any other person or who conspires with another to kill or who procures another to kill any person. This denial of inheritance shall include any property which the person so killing would otherwise have inherited, whether real, personal, or mixed, or any part thereof, belonging to the deceased person at the time of

---

*ington*, 11 Ga. 337 (8) (56 Am. D. 423) (1852)).

[2] *Crawford v. Crawford*, 218 Ga. 369, 370 (128 SE2d 53) (1962), citing *Slade v. Slade*, 155 Ga. 851 (4) (118 SE 645) (1923), and *Butler v. Lashley*, 197 Ga. 461 (29 SE2d 508) (1944).

[3] See *Sweat v. Hughes*, 219 Ga. 703, 706 (135 SE2d 409) (1964).

[4] *Yancey v. Hall*, 265 Ga. 466, 469 (3) (458 SE2d 121) (1995) (holding that trial court did not err in granting summary judgment on issue that will was procured by fraud, since the caveators' allegations of fraud went "only 'to matters which do not appear to have had any bearing or influence upon [Harris] in the making of [his] will.' *Marlin v. Hill*, 192 Ga. 434, 440 (15 SE2d 473) (1941)").

[5] *Arnau v. Cochran*, 257 Ga. 550, 551 (2) (361 SE2d 173) (1987).

death, or any property which the person so killing would take by deed, will, or otherwise at the death of the decedent. All right, interest, and estate in and to the property shall go to such other heirs as may be entitled thereto by the laws of descent and distribution or by will, deed, or other conveyance duly executed by the decedent in his lifetime. For the purpose of determining the descent and distribution through the person so killing, he shall be treated as though he had predeceased the person killed.

James Cornwell was admitted to the emergency room of a Humana Hospital on December 19, 1992. The notes of one of the two attending physicians state that the patient's situation was discussed with the "patient's closest friends who are taking care of this patient very closely and diligently and who strongly recommended against any aggressive treatment such as CPR or dialysis. As per the discussion it appeared that this was the patient's wish that he had expressed in the past." The notes also provide that

with the passage of time and with hydration and nutritional support the patient's general condition improved and his consciousness returned and he was quite alert. . . . Patient was subsequently transferred out of intensive care unit and was started on oral feeding as his swallowing had improved. Mental status had much improved and patient was communicative and was quite bright and alert. At this point, the patient's care-taker had ruled out nursing home placement and therefore planning for arranging rhab [sic] transfer was being made. Unfortunately, the patient's renal condition did not improve but continued to show progressive worsening. . . . [S]ubsequently [an anticoagulant] was considered but in view of patient's age, Parkinson's disease, and falls and being unattended during the day time, the risk was considered quite high by patient's care takers. They had declined the idea of anticoagulation and considering whole situation this was considered to be appropriate. . . . Patient was awaiting a rehab placement and unfortunately had terminal cardiorespiratory arrest on 12/28/92. . . . Cardioresuscitative measures were not undertaken because of DNR status at care-takers and patient's wish."

Relying on the portions of these notes indicating that the Shumates did not desire aggressive medical procedures for Mr. Cornwell and that the Shumates represented to medical personnel that Mr. Cornwell had expressed similar desires, the appellants contend such

evidence would allow a jury to conclude that the Shumates acted as if Mr. Cornwell had executed a living will under the provisions of OCGA § 31-32-1 et seq., or as if they held a health care power of attorney under the provisions of OCGA § 31-36-1 et seq. The appellants further contend that such conduct would violate the criminal provisions of OCGA §§ 31-32-10 and 31-36-9 (2), subjecting the Shumates to disinheritance under § 53-4-6. In this regard, § 31-32-10 provides in relevant part that

> [a]ny person who falsifies or forges the living will of another . . . with the intent to cause a withholding or withdrawal of life-sustaining procedures contrary to the wishes of the [patient] and, thereby, because of any such act, directly causes life-sustaining procedures to be withheld or withdrawn and death thereby to be hastened shall be subject to prosecution for criminal homicide as provided in Chapter 5 of Title 16.

Section 31-36-9 (2) contains a similar provision concerning a person who falsifies or forges a health care agency.

We find that the trial court properly granted summary judgment as to these contentions. First, by basing criminal liability upon the act of falsifying or forging a living will or health care agency, both §§ 31-32-10 and 31-36-9 (2) clearly contemplate that a written, but forged or falsified, living will or health care agency must be the cause of the withholding of life-sustaining procedures. This interpretation is consistent with the provisions governing living wills and health care agencies, which provide that no withholding of life-sustaining procedures can occur without a written document that complies with numerous requirements and is executed by the patient.[6] Because there is no written living will or health care agency in the record, nor even any allegation that such documents exist, the Shumates were entitled to judgment as a matter of law on the claim that they are subject to criminal liability on the ground they falsified or forged a living will or health care agency.

Further, although the appellants do not base their claim that the Shumates caused the death of Mr. Cornwell solely upon the Code sec-

---

[6] See OCGA § 31-32-3 (living will must be signed by declarant in presence of two witnesses who, among other requirements, would not be entitled to any portion of the declarant's estate); OCGA § 31-32-4 (if living will is executed in hospital or skilled nursing facility, patient must sign it in presence of two witnesses and in the presence of a representative of the hospital or skilled nursing facility who is not participating in the care of the patient); OCGA § 31-32-8 (a) (3, 4) (before withholding life-sustaining procedures under a living will, a physician must make a reasonable effort to determine that the living will has been properly executed and must make the living will a part of the patient's medical record). For similar provisions regarding health care agencies, see OCGA §§ 31-36-5 (a) and 31-36-7.

tions that prescribe when orders not to attempt cardiopulmonary resuscitation may be issued,[7] one of those provisions, OCGA § 31-39-4 (a), provides that only the attending physician can issue a DNR order, and that the attending physician has the responsibility to issue such an order in accordance with the statutory guidelines.[8] These guidelines, in turn, provide that "an adult with decision-making capacity may consent" to an order not to resuscitate;[9] that "[t]he appropriate authorized person" may consent to a DNR order;[10] that a parent may consent to a DNR order for his or her minor child;[11] and that if none of the foregoing persons is available or competent to make a decision regarding a DNR order, the attending physician may issue a DNR order after satisfying certain conditions.[12] An "authorized person" is defined as a health care agent appointed pursuant to Chapter 36 of Title 31; a spouse; a guardian appointed pursuant to § 29-5-1; a son or daughter 18 years of age or older; a parent; or a brother or sister 18 years of age or older.[13]

Here, the record is devoid of any evidence that the Shumates misled hospital personnel or the attending physician so as to obtain a DNR order. First, as previously noted, there is no evidence in the record that the Shumates fraudulently induced the hospital to rely upon a written health care agency in the Shumates. Second, the record establishes that the Shumates informed emergency room personnel, hospital personnel, and the attending physicians that they were friends of Mr. Cornwell and that Mr. Shumate had only a general power of attorney. When the Shumates admitted Mr. Cornwell to the hospital, a copy of Mr. Shumates's power of attorney was made a part of Mr. Cornwell's hospital record. Further, the notes of the attending physician who issued the DNR order demonstrate that he was aware

---

[7] See OCGA §§ 31-39-1 to 31-39-9.

[8] Subsection (a) of § 31-39-4 provides as follows:

(a) It shall be lawful for the attending physician to issue an order not to resuscitate pursuant to the requirements of this chapter. Any written order issued by the attending physician using the term "do not resuscitate," "DNR," "order not to resuscitate," "no code," or substantially similar language in the patient's chart shall constitute a legally sufficient order and shall authorize a physician, health care professional, or emergency medical technician to withhold or withdraw cardiopulmonary resuscitation. Such an order shall remain effective, whether or not the patient is receiving treatment from or is a resident of a health care facility, until the order is canceled as provided in Code Section 31-39-5 or until consent for such order is revoked as provided in Code Section 31-39-6, whichever occurs earlier. An attending physician who has issued such an order and who transfers care of the patient to another physician shall inform the receiving physician and the health care facility, if applicable, of the order.

[9] OCGA § 31-39-4 (b).

[10] OCGA § 31-39-4 (c).

[11] OCGA § 31-39-4 (d).

[12] OCGA § 31-39-4 (e) (1-3).

[13] OCGA § 31-39-2 (3) (A-F).

that the Shumates were friends and caretakers of Mr. Cornwell. The other attending physician was Mr. Cornwell's personal doctor to whom the Shumates brought Mr. Cornwell for regular visits. Because of that relationship, that doctor knew that the Shumates were friends with Mr. Cornwell and not relatives. Because the record demonstrates that the Shumates did not mislead the attending physician to believe that they were authorized persons within the meaning of § 31-39-2 (3), and because § 31-39-4 (a) squarely places the burden upon the attending physician to issue a DNR order pursuant to the requirements of Chapter 39 of Title 31, the decision to issue the DNR order can only be attributed to the attending physician. Thus, any contention that the Shumates procured the death of Mr. Cornwell with malice aforethought by improperly obtaining a DNR order cannot survive summary judgment.[14]

For the foregoing reasons, we conclude the trial court properly granted summary judgment to the Shumates on the appellants' claim that they were barred from taking Mr. Cornwell's property under § 53-4-6.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 11, 1996.

*Eidson & Associates, James A. Eidson, Timothy R. Brennan,* for appellants.

*Theodore P. Bianco,* for appellees.

---

[14] We note that the attending physician had the discretion to obtain input from the Shumates, who were Mr. Cornwell's primary caretakers for a number of years, before issuing a DNR order, and that the attending physician, based upon Mr. Cornwell's age and condition, agreed with the Shumates' recommendations not to perform aggressive medical care.